2008 WY 58

**Ladonna J. CAROTHERS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–07–0240.

Supreme Court of Wyoming.

May 29, 2008.

3

Representing Appellant: Nicholas H. Carter and Miles A. Jacoby of The Nick Carter Law Firm, P.C., Gillette, Wyoming. Argument by Mr. Carter.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶1]  The appellant was convicted of aggravated homicide by vehicle after she caused the death of a ten-year-old girl in a motor vehicle collision in Gillette, Wyoming. The conviction was premised on the dual theories of driving with a blood-alcohol concentration in excess of 0.08%, and driving while under the influence of alcohol to a degree that rendered her incapable of safely driving. *See* Wyo. Stat. Ann. § 6–2–106(b) (LexisNexis 2007) and Wyo. Stat. Ann. § 31–5–233(b) (LexisNexis 2007). In this appeal, the appellant raises issues concerning jury selection, venue, prosecutorial misconduct, and the presentence investigation report (PSI). We affirm.

## ISSUES

[¶2]  1. Did the district court abuse its discretion when it did not excuse certain jurors for cause?

2. Did the district court abuse its discretion when it denied the appellant's motion for a change of venue?

3. Did certain statements by the prosecutor during rebuttal closing argument constitute plain error?

4. Did the district court abuse its discretion when it denied the appellant's motion to strike from the PSI the recommendations of the probation and parole agent who prepared it?

## FACTS

[¶ 3] The details of this tragic incident are not especially relevant to a determination of the issues presented. Suffice it to say that on October 17, 2006, the appellant caused a multi-vehicle collision that killed ten-year-old Madison Scalzo. The appellant, who had a blood-alcohol concentration in excess of 0.08% at the time, lost control of her vehicle while talking on her cellular phone and crashed into a parked car. The appellant admitted that she was also taking prescription medications that were not to be consumed with alcohol. Her unsuccessful trial defense was the collision was caused by "pedal error," rather than by alcohol use.

## DISCUSSION

### *Did the district court abuse its discretion when it did not excuse certain jurors for cause?*

[¶ 4] Prospective jurors are questioned during the *voir dire* process for the sole purpose of selecting "a panel of jurors who will fairly and impartially hear the evidence and render a just verdict." [1] W.R.Cr.P. 24(c)(1). For purposes of the present discussion, jurors may be excused "for cause" if they are biased or prejudiced against the defendant, or have formed or expressed an opinion as to guilt. Wyo. Stat. Ann. § 7–11–105(a)(ii) and (b) (LexisNexis 2007); Wyo. Stat. Ann. § 1–11–203(a)(vi) and (vii) (LexisNexis 2007).

The test we apply to determine if a prospective juror should be dismissed for cause is whether or not that juror would be able to render a fair and impartial verdict based upon the evidence adduced at trial and the court's instructions. *Kerns v.*

*State,* 920 P.2d 632, 635 (Wyo.1996) (citing *Munoz v. State,* 849 P.2d 1299, 1302 (Wyo. 1993)). The question of whether a juror is biased is a question of fact reserved for the trial court. *Id.; Jahnke v. State,* 682 P.2d 991, 1000 (Wyo.1984) [*overruled in part on other grounds by Vaughn v. State,* 962 P.2d 149 (Wyo.1998) ]. We review the trial court's decision for an abuse of discretion. *Kerns,* 920 P.2d at 635; *Munoz,* 849 P.2d at 1302.

*Klahn v. State,* 2004 WY 94, ¶ 9, 96 P.3d 472, 478 (Wyo.2004). We defer to the judgment of the district court because it can personally observe the demeanor of the jurors and the tenor of their responses. *Schwenke v. State,* 768 P.2d 1031, 1033 (Wyo.1989); *Summers v. State,* 725 P.2d 1033, 1041 (Wyo.1986). Even where a prospective juror has previously formed or stated an opinion as to the defendant's guilt, the ultimate question is whether the juror can set aside that opinion and impartially determine the case based upon the evidence. Wyo. Stat. Ann. § 7–11–106 (LexisNexis 2007); *Duke v. State,* 2004 WY 120, ¶ 23, 99 P.3d 928, 939 (Wyo.2004); *Klahn,* 2004 WY 94, ¶ 10, 96 P.3d at 479; *Sides v. State,* 963 P.2d 227, 231 (Wyo.1998).

[¶ 5] The appellant contends that the district court acted arbitrarily in the instant case by excusing some jurors, but seating others, when all gave similar responses when asked if they had formed an opinion as to the appellant's guilt. There were six jurors, three of whom were excused and three of whom were not, that the appellant finds particularly troubling. Because it is necessary to examine the questions and answers in full context when examining allegations of bias, we will set forth the challenged jurors' *voir dire* statements in detail, beginning with their initial responses to questions posed in regard to opinions they may have formulated. *See Schwenke,* 768 P.2d at 1034. So as not to call undue attention to the jurors, we will identify the three excused jurors as Mr. W., Ms. R., and Ms. E., and the three non-excused jurors as Mr. C., Ms. B., and Ms. C.:

[PROSECUTOR]:....

Do any of you have any knowledge about those events and that collision that you

---

1. *Voir dire* is French for "to speak the truth." *Black's Law Dictionary* 1605 (8th ed.2004).

bring with you to the courtroom today? And if you'd hold up your hands for just a minute and keep them up I'll visit with you one at a time.

Mr. [W.]?

MR. [W.]: Yes.

[PROSECUTOR]: Okay. The information that you have did it come from firsthand knowledge or individuals involved in those events?

MR. [W.]: No.

[PROSECUTOR]: Okay. Did it come from the newspaper?

MR. [W.]: Yes.

[PROSECUTOR]: Okay. Would you be able to set aside that information and base any decision that you make in this case on what you hear in the courtroom?

MR. [W.]: No.

. . . .

[PROSECUTOR]: . . . .

Is there anybody—Ms. [R.], did you have your hand up?

MS. [R.]: Yeah, I did. I read about it in the newspaper and my daughter was friends with the deceased and I heard a lot.

[PROSECUTOR]: From that information have you—

MS. [R.]: I don't think I can be fair.

. . . .

[PROSECUTOR]: . . . . Anybody else? Okay, I'm going to start here.

MS. [E.]: I read it in the paper.

[PROSECUTOR]: All right. Did you receive any information other than what you read?

MS. [E.]: No.

[PROSECUTOR]: Have you formulated an opinion based on that?

MS. [E.]: Yes.

[PROSECUTOR]: Would you be able to set that aside? That was No. 1.

MS. [E.]: Yes.

. . . .

[PROSECUTOR]: Okay. All right.

MR. [C.]: I've read like everybody else has the stuff that was in the paper. I do have two kids that do go to Wagonwheel School that bring me some other information that is relevant.

[PROSECUTOR]: Did the information in this paper that you read cause you to formulate an opinion about the facts in this case?

MR. [C.]: I'm afraid I probably would be pretty strong sided.

. . . .

[PROSECUTOR]: . . . . Ms. [B.]?

MS. [B.]: I read about it in the newspaper.

[PROSECUTOR]: Okay. Did you formulate any opinions about it after reading it in the newspaper?

MS. [B.]: Yes.

[PROSECUTOR]: Would you be able to set aside those opinions and base your opinion on what you hear in the court room?

MS. [B.]: I don't know. I probably could but I'm just not sure.

. . . .

[PROSECUTOR]: Ms. [C.]?

MS. [C.]: Read about it in the paper.

[PROSECUTOR]: Did you formulate any opinions after reading it?

MS. [C.]: Yes.

[PROSECUTOR]: Would you be able to set aside those opinions and that information and render a verdict on what you hear in the courtroom?

MS. [C.]: I can't honestly say that I would.

[¶ 6]  It is these passages upon which the appellant focuses in contending that the district court was arbitrary in excusing some, but not all, of these jurors. There was, however, additional questioning that helped the district court analyze the jurors' ability to set aside any preconceived opinions:

[PROSECUTOR]: Would you be able to set aside those feelings and that information and render a verdict based upon what you hear in the courtroom if you're selected as a juror?

MR. [C.]: Yes, I believe I could. I was in a situation five or six years ago that was kind of one-sided and you know I knew it, both sides. I knew the people to both

sides and I feel it wasn't fair to the other people involved.

[DEFENSE COUNSEL]: Do you come into the case as a potential juror with an opinion as to my client's guilt?

MR. [C.]: I guess, yeah.

[DEFENSE COUNSEL]: Okay. And what is that opinion?

MR. [C.]: Well, I guess—my guess is that the woman—I have the feeling that what if that was my child. Maybe I didn't understand your question.

[DEFENSE COUNSEL]: And I understand everybody would be upset about the death of a young child but the question is do you, would you take to the jury box, if you were selected as a juror, with an opinion as to my client's guilt as to these charges before you heard any evidence?

MR. [C.]: No, I don't believe I would. I would try to listen to the whole case.

[DEFENSE COUNSEL]: Okay. When you say try, would you follow the law that says you must presume her innocent and you must acquit if the State does not prove their case?

MR. [C.]: Yes, I believe so.

[DEFENSE COUNSEL]: Would you feel any pressure to convict my client based on your children or your knowledge of the case?

MR. [C.]: That's a possibility.

[DEFENSE COUNSEL]: Okay. What kind of possibility, if you could explain that to the court.

MR. [C.]: I'm not a good speaker but I don't know, I guess I would have to view all sides of the, both sides of the case.

[DEFENSE COUNSEL]: Do you think that the defendant would have to prove her innocence to you?

Mr. [C.]: Yes.

[DEFENSE COUNSEL]: Okay. I have no further questions, Your Honor.

THE COURT: Mr. [C.], if the law requires the State to prove the case beyond a reasonable doubt and that's the law and not the defendant proving innocence, could you follow the law that's given to you in the case?

MR. [C.]: To the best of my knowledge, yes.

THE COURT: Even though it's against what you just said in your last answer, you would want her to prove her innocence? It's not her obligation, it's the State's obligation to prove her guilt. You would have to follow the law. You would want to see her prove her innocence?

Mr. [C.]: Yes, I would follow the law.

. . . .

[PROSECUTOR]: Would you be able to set that information aside and render a verdict only on what you hear in the courtroom?

MS. [B.]: Yes.

[PROSECUTOR]: Was there anything else about the case or information that you bring into the courtroom that causes you concern about serving as a juror?

MS. [B.]: No. There's always two sides to every story and a person should listen to both sides.

[PROSECUTOR]: I don't have any other questions. Thank you, Judge.

[DEFENSE COUNSEL]: When you say—did you say that you have formed an opinion?

MS. [B.]: I have formed an opinion but I really do need to listen to the other side.

[DEFENSE COUNSEL]: And what opinion is that?

MS. [B.]: I just really had a hard time with the accident and her drinking but I'm willing to listen to her side of the story as well.

[DEFENSE COUNSEL]: Let me ask you this. Do you have such an opinion that if you were on trial you'd want you to sit on the jury?

Ms. [B.]: No.

[DEFENSE COUNSEL]: And why is that?

MS. [B.]: Because my opinion could be swayed either way.

[DEFENSE COUNSEL]: Well, do you understand the concept as to, about presumption of innocence?

MS. [B.]: Yes.

[DEFENSE COUNSEL]: And you would apply that to my client, the presumption of innocence, despite your previous opinion?

MS. [B.]: Yes.

[DEFENSE COUNSEL]: Do you think that you can give my client a fair trial?

MS. [B.]: I can sure try. That's all I can say, I can sure try.

[DEFENSE COUNSEL]: Well, I don't know if trying is good enough and I just want you to look into your heart as to whether you can sit as a juror and give my client a fair trial.

MS. [B.]: I can do that.

. . . .

THE COURT: What is the source of your not being able to say you can set that aside and just make a decision based upon what's heard in the courtroom?

MS. [C.]: Because her blood alcohol was printed in the paper. She did take prescription drugs and you're not supposed to mix the two. You are given the information by the doctor when you pick up the prescription.

THE COURT: Okay. But let's suppose your information in court was different than what was in the paper would you be able to make a decision based upon what you hear in court and ignore what you read in the paper if the paper was wrong? I don't know what the paper said. Could you ignore it and only make a decision based on what's heard in the courtroom and which may or may not match?

MS. [C.]: I can do my best. Like I said, I can't guarantee that I would. I have children.

THE COURT: Well, okay. You know, I know it's a difficult question.

MS. [C.]: It is hard.

THE COURT: But I just need to know. If there was something that was different from the paper than what you heard in the courtroom, the question is whether you would base it only upon what was heard in the courtroom?

MS. [C.]: Yes.

. . . .

[DEFENSE COUNSEL]: Okay. Earlier [the prosecutor] asked you to presume [the defendant] innocent given the knowledge that they have.

MS. [C.]: And I stated from what I've read in the paper—like I said, I can't honestly give that answer, that I think she's innocent at this point.

[¶ 7]  In addition to this individual questioning during the State's portion of *voir dire*, the entire panel was also asked many broad questions during the defense *voir dire*, including: whether they felt they could not afford the appellant the presumption of innocence; whether they felt they could not set aside any information about the case they had read in the newspaper; whether the death of a child made them feel that someone should be convicted; whether the facts of the case were so sad that they could not fairly consider the evidence; and whether they felt that they could not be fair jurors. Not a single juror, including Mr. C., Ms. B., and Ms. C., answered in the affirmative.

[¶ 8]  One way to evaluate the exercise of a district court's discretion in relation to juror challenges for cause is to ask, first, whether the court exercised any discretion at all. In other words, did the district court simply disregard bias challenges? That was certainly not true in this case, where thirteen jurors were dismissed for cause, with twelve of the thirteen dismissed for expressing an inability to be fair to the appellant. Moreover, when explaining its reasoning for leaving Mr. C., Ms. B., and Ms. C. on the panel, the district court clearly enunciated that its decision making as to individual jurors was based upon its perception as to whether they truly could or would set aside any improper influences. These are the precise circumstances where, based upon a cold record, we are not going to substitute our judgment for that of the district court. One can, perhaps, pick out a word, or a phrase, or a sentence here and there and contend that, given that answer, the juror should have been dismissed. But viewed in its totality, the *voir dire* is revealed to have been a careful and deliberate process, designed to ferret out the truth. There was no abuse of discretion.

### Did the district court abuse its discretion when it denied the appellant's motion for a change of venue?

[¶ 9] Article 1, Section 10 of the Wyoming Constitution provides that criminal defendants are entitled "to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed." In turn, Wyo. Stat. Ann. § 1-7-102(a) (LexisNexis 2007) requires that "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." Finally, W.R.Cr.P. 18 provides that, "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall take place in the county in which the offense is alleged to have been committed...." Notwithstanding these mandates, W.R.Cr.P. 21(a) allows for trial elsewhere in the event of local prejudice that is too great for the defendant to receive a fair trial:

(a) *Prejudice within county.*—Upon timely motion of the defendant, the court shall transfer the proceeding as to that defendant to another county, but only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county.

[¶ 10] At the end of the *voir dire* questioning, but before the exercise of peremptory challenges, the appellant filed a motion for change of venue, which motion contained the following listed arguments: (1) so great a prejudice existed locally against the appellant that she could not receive a fair trial; (2) there had been extensive pre-trial publicity about the case in the local media; (3) denial of the appellant's earlier motion for a jury questionnaire prevented earlier discovery of the extent of the prejudice; (4) until *voir dire*, the appellant did not discover the depth of knowledge and the intensity of opinions that would be held by prospective jurors; (5) failure to change venue would violate the appellant's constitutional rights to a fair trial; and (6) it would be in the best interests of justice to change the venue of the trial. During the hearing on the motion in chambers, defense counsel emphasized the large num-

ber of prospective jurors who held strong opinions about the appellant's guilt as a result of the pre-trial publicity. The district court said the following in denying the motion:

THE COURT: All right. In considering the fact that we've got 31 who say they can grant the defendant the presumption of innocence and despite some last minute cross questioning or final questioning by the defense, no one even seemed to raise an eyebrow or an arm with this last questioning. I think we have a panel that can fairly hear this case and that's why I'm going to deny the motion for change of venue.

[¶ 11] We have identified the following standard for reviewing a district court's denial of a motion for change of venue:

We review the denial of a motion for change of venue under an abuse of discretion standard, meaning we will not interfere with the trial court's decision unless the trial court acted in a manner exceeding the bounds of reason under the circumstances. *Nixon v. State*, 994 P.2d 324, 326–27 (Wyo.1999). The party moving for change of venue has the burden of showing actual prejudice in the minds of the jurors so great that a fair trial cannot be obtained. *Id.* at 327.

. . . .

This Court has adopted a two-part test for determining whether a change of venue should be granted after *voir dire* because of pre-trial publicity: " 'First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination.' " *Sides [v. State]*, 963 P.2d [227,] 231 [ (Wyo. 1998) ] (quoting *Murry [v. State]*, 713 P.2d [202,] 208 [ (Wyo.1986) ] ).

*Urbigkit v. State*, 2003 WY 57, ¶¶ 26–27, 67 P.3d 1207, 1220 (Wyo.2003). Prejudice will not be presumed from mere local publicity; such presumption will rarely be invoked and only in extreme circumstances. *Sanchez v. State*, 2006 WY 116, ¶ 13, 142 P.3d 1134, 1139 (Wyo.2006). To require venue to be

changed, pre-trial publicity must be so inflammatory as practically to dictate the community's opinion. *Id.*

[¶ 12] We will somewhat summarily affirm the district court's denial of this motion for change of venue, for two reasons: first, the nature and extent of the pre-trial publicity has not been shown; and second, an impartial jury was seated with relatively little difficulty. No newspaper articles, or other forms of pre-trial publicity were presented below, or in this Court, so we do not know that such publicity was anything but factual, and factual accounts are not, in and of themselves, prejudicial. *Collins v. State*, 589 P.2d 1283, 1289 (Wyo.1979). This case is similar to *Murry v. State*, 713 P.2d 202, 208 (Wyo.1986), where we said the following:

It is to be expected that most of the jury panel will have heard about a sensational case, but there is no requirement that a juror be ignorant of the facts and issues involved in a case. *Wilcox v. State*, [670 P.2d 1116, 1119 (Wyo.1983) ]. The totality of the circumstances must indicate the presence of improper prejudice. *Weddle v. State*, Wyo., 621 P.2d 231 (1980). The question focuses on whether a fair jury was ultimately seated. *Shaffer v. State*, [640 P.2d 88, 103 (Wyo.1982)]. We recently reaffirmed these basic principles in *Pote v. State*, Wyo., 695 P.2d 617 (1985).

[¶ 13] A fair and impartial jury was seated in this case when the requisite number of jurors, despite the existence of apparently substantial pre-trial publicity, declared themselves able to set aside anything they had read or heard about the case, and able to set aside any opinions they had previously reached, and declared themselves able to determine the matter based solely upon the evidence they heard in court and the instructions given them by the judge. We affirm the denial of the motion for change of venue.

*Did certain statements by the prosecutor during rebuttal closing argument constitute plain error?*

[¶ 14] Although she did not object to them below, the appellant contends in this appeal that certain statements of the prosecutor during rebuttal closing argument constituted plain error. Our standard of review in such instances is as follows:

The general rule in Wyoming is that a failure to interpose a timely objection to improper argument is treated as a waiver, unless the prosecutor's misconduct is so flagrant as to constitute plain error, requiring reversal. *Armstrong v. State*, 826 P.2d 1106, 1115 (Wyo.1992). A plain error analysis requires the appellant to demonstrate the violation of a clear and unequivocal rule of law, clearly reflected in the record, resulting in the abridgment of a substantial right of the party to his material prejudice. *Arevalo v. State*, 939 P.2d 228, 232 (Wyo.1997). We are reluctant to find plain error in closing arguments "lest the trial court becomes required to control argument because opposing counsel does not object." *James v. State*, 888 P.2d 200, 207 (Wyo.1994) (quoting *Taul v. State*, 862 P.2d 649, 659 (Wyo.1993)).

In analyzing claims of prosecutorial misconduct, we consider the prosecutor's argument in the context in which it was made and with regard to the evidence produced at trial. *Taul v. State*, 862 P.2d 649, 659 (Wyo.1993). Although counsel are allowed great latitude in the argument of cases, argument must be kept within the evidence. *Dice v. State*, 825 P.2d 379, 384 (Wyo.1992). Statements calculated to inflame, prejudice or mislead the jury are not permitted. *Taul*, 862 P.2d at 659.

*Montoya v. State*, 971 P.2d 134, 136 (Wyo. 1998).[2] Reversal is required where a reason-

---

2. Whether the appellant's brief in this case contains a legitimate plain error analysis is a debatable question. The lack of such analysis may cause us to disregard the argument. *Schultz v. State*, 2007 WY 162, ¶ 19, 169 P.3d 81, 87 (Wyo. 2007); *Pena v. State*, 2004 WY 115, ¶ 44 n. 7, 98 P.3d 857, 874 n. 7 (Wyo.2004); *Doyle v. State*, 954 P.2d 969, 975 (Wyo.1998); *Billis v. State*,

800 P.2d 401, 433–34 (Wyo.1990). We have given the appellant the benefit of the doubt because, while the brief does not track normal plain error analysis, it does show that the record clearly reflects the alleged misconduct, and it identifies the constitutional rights that the alleged misconduct violated. It is left for us to conjecture that, by claiming a fair trial was de-

able probability exists that, absent the error, a verdict more favorable to the appellant would have resulted. *Szymanski v. State*, 2007 WY 139, ¶ 27, 166 P.3d 879, 886 (Wyo. 2007). The burden of proving plain error is upon the appellant. *Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo.2007).

[¶ 15] The appellant contends that several statements made by the prosecutor during rebuttal closing argument violated two of her basic constitutional rights: that the prosecutor may not comment upon the defendant's exercise of her right to remain silent, and the prosecutor may not attempt to shift the burden of proof to the defendant. *See Condra v. State*, 2004 WY 131, ¶ 17, 100 P.3d 386, 390–91 (Wyo.2004); *Tortolito v. State*, 901 P.2d 387, 390–91 (Wyo.1995). The State counters with the argument that the prosecutor's statements were legitimate responses to defense counsel's arguments, and were legitimate comments about the state of the evidence. Because this all must be viewed in context, we will quote at length from defense counsel's closing argument, and from the State's rebuttal, with the challenged statements being highlighted:

BY [DEFENSE COUNSEL]:

. . . .

So lets start there, lets talk about evidence, ladies and gentlemen, and lets talk about proof and lets talk about assumptions, presumptions, and hopes, and witnesses that you never heard or saw, and lets talk about the State's case. The State's case is this.

They would have you believe that my client, who they've presented no evidence, would have any motive to do or to lie or that she's a known liar or is inconsistent or has lied in the past would be driving down the street, that she would get into a wreck, and then she would floor her car to 100 percent to get away from some sort of problem that she was in because she had consumed some amount of alcohol. The problem with that presupposition is really twofold.

First of all, they have to convince you of that. In other words, they have to only call witnesses that support that. They have to get witnesses to say that version of events because if they don't they lose. And why do they lose? Because then the original wreck and the alcohol are not tied to the ultimate death of Madison Scalzo, then you must acquit according to the law.

So what does the State do? They call basically two witnesses to support the proposition that my client got into a wreck, that she didn't lose control of the vehicle but that she fled the scene. [SP] was the first. [SP] says, oh, I remember like it was yesterday, I saw it in my rearview mirror, I am 100 percent sure, absolutely no question about it that this is what took place, she backed up and then she sped off.

But we find out that only two days after the wreck—and this had not come out when Detective Wasson testified, first testified. But two days after the wreck she had spoke to Detective Wasson who is investigating the wreck. And what does she say? She says that she sees it in the rearview mirror, she sees the wreck, she thought the vehicle might have slowed, didn't think it came to a stop, and then it sounded like the motor revved up and it went on.

. . . .

Another aspect of that that's very interesting is that you heard Detective Wasson say that he had consulted with Mark Ziska who is with the police department. And that Mark Ziska is a crash reconstructionist that works for the Gillette Police Department. Interesting that we didn't find any testimony and never saw Mr. Ziska testify because after all if he's a crash reconstructionist and he was observing the scene, he was there that night, certainly he could have gotten up on the stand under oath and showed you the pictures and showed you where my client backed up.

They don't call him. You know why? Because they know he wouldn't say that and that doesn't fit in with their case and

nied to her, the appellant is claiming that a fair trial would have resulted in a more favorable

verdict.

that doesn't lead to a conviction, and then where are they because you've got to get a conviction, afterall [sic] something terrible has happened.

Most troubling, even more than Mr. Ziska, however, is that we know there's yet another eyewitness named [LSW]. She was listed in the State's pretrial. Do we see her? She didn't testify. The State chose not to give you that evidence, and what do I ask Detective Wasson? Hey, you interviewed several people, didn't you? Yes. You interviewed [LSW]? Yes. And she said she never saw the vehicle stop. That, in fact, it slowed after the collision, roar of the engine, and it was off to the races.

Why do you think the State would not want you to hear that witness, eyewitness testimony? Why do they cherry pick only the things that are good for them? And I'll tell you why and it's quite, so simple. Because they know if this is unintended acceleration they can't make their proximate cause and they lose the aggravated vehicular homicide case.

. . . .

The State doesn't want to talk about [unintended acceleration]. They are hoping that because of your overwhelming grief, just like mine, that you'll just kind of overlook the flaws in their case. You'll overlook the fact that they don't call witnesses. You'll overlook the fact that they don't talk about the physical evidence.

You'll overlook the fact that there was an eyewitness that could have testified to something different. You'll overlook the idea that Mark Ziska didn't testify. That you'll overlook all of that because there must be a reckoning. Yet, the law forbids you to be governed by sympathy, prejudice, or public opinion.

. . . .

Another issue about the intoxication, ladies and gentlemen, is that—and once again it goes to, it goes to why didn't we hear from someone? And that is you heard [MM] testify, and he says, well, at 10 until 6 I saw her. She walked into the rec center, I chatted with her, nothing seemed up, I didn't smell any alcohol, she didn't seem intoxicated to me, she didn't seem to have any problem.

. . . .

By the same token Wasson works for the Gillette Police Department, and they certainly have an interest in the outcome of this case. Take a look around in the courtroom. There are at least six or eight different officers that are watching this closing argument. They certainly have an interest in the outcome of the case.

What about the ER staff? Would they have an interest in the outcome of the case? If she smelled of alcohol, if she was slurring her words, if she seemed so intoxicated following this wreck, where are the ER staff? How come they're not called?

. . . .

BY [THE PROSECUTOR]:

. . . .

You get to decide who you believe. You get to decide who is credible. You get to decide who's got an interest in this in making those determinations. And does the fact that you only heard us call [SP] and [TM] mean there's got to be a reasonable doubt with respect to the facts? Absolutely not.

Ladies and gentlemen, those jury instructions say you can find the proof of one fact beyond a reasonable doubt from one witness that you find believable. There is no minimum requirement. There is no rule that says that every single witness who was involved in the case has to come to court and testify about that.

*Can you imagine, ladies and gentlemen, if there was some evidence out there to establish that an EMT while rendering aid to LaDonna Carothers poured a beer in her mouth that somebody might have called that witness? Probably very likely you would have heard from that person.*

*If there was evidence to establish that with respect to the telephone calls that she talked to Detective Wasson about actually got made and that there's a cell phone record documenting that cell phone call, do you think if that had actually happened there would be evi-*

*dence to support that? Probably, you would have heard that.*

You heard the evidence from two eyewitnesses who watched her drive drown [sic] Brooks Avenue. You heard testimony from Detective Wasson who summarized the accident investigation. You're right, you didn't hear from Mark Ziska. Instead the State of Wyoming called [GB] who is a mechanical engineer who looked at all of the evidence, who examined the vehicle, who has specialized training and is an expert in this field, and interestingly enough is not sitting in the audience and is not a member of the Gillette Police Department.

He is a person who has a very refined specific task and he was given the job of examining the evidence in an objective fashion and telling you what the facts mean. Would it have been helpful to hear Mark Ziska come in and say the same thing? Probably not. If Mark Ziska had something different to say do you think that somebody might have called him and had him say that? Probably so.

. . . .

Look at the evidence that you have and use your common sense and look about what you heard in the courtroom and don't start trying to decide if there's other stuff out there that might be because that's not your job. Your job is to evaluate what you heard in this courtroom and evaluate the witnesses you heard in this courtroom, and when you do that the evidence is very easy to interpret and the verdict is very easy to reach because what you will find is there is no doubt that the defendant was drinking that day.

She even tells you how much she was drinking, the scientific evidence corroborates that. There's no doubt that she hit a parked car. There's no doubt she sped away from the scene. *And, ladies and gentlemen, really the difficulty here with [Defense Counsel's] whole argument about unintended acceleration is there's no evidence even from the defendant that that's what happened.*

You heard Mr. Schmidt tell you that the key to this entire phenomenon, if you will, is that the driver has to say I was pushing down on what I thought was the brake and my car was careening out of control. And you heard her statement, you heard what she told Detective Wasson within an hour, an hour an a hour after the wreck.

She didn't say she stepped on the wrong peddle [sic]. She said the car spontaneously, all by itself, it was touched or anything, it was some sort of high idle thing and it was going down the road at maximum throttle by itself. And even Mr. Schmidt had to tell you that's not unintended acceleration.

(Emphasis added.)

[¶ 16] We have quoted at such length from the closing arguments to show the context of the prosecutor's remarks in rebuttal. Most of those remarks were clearly directed at refuting defense counsel's allegations that the State purposefully hid evidence from the jury by not producing certain witnesses. The prosecutor was not suggesting that the appellant had a duty to call witnesses. Rather, he was explaining why the State called the witnesses that it did, and not others. In addition, the prosecutor's comment that "there's no evidence even from the defendant" that unintended acceleration caused the accident, was not a comment upon the appellant's right to remain silent, but was a comment about the contents of the statement that the appellant did give to the police.

[¶ 17] Two cases clearly guide us to an affirmance on this issue. In *Helm v. State*, 1 P.3d 635, 641 (Wyo.2000), we found it proper for the State to comment upon the lack of factual support for the defendant's theory of the case. That is exactly what happened here. The appellant brought in an expert witness to explain to the jury the phenomenon known as "pedal error" or "unintended acceleration." The point of the prosecutor's closing remarks was simply that there was insufficient evidence in the appellant's statement to police to support that theory. That is not an attempt to call attention to her decision not to testify, nor is it an attempt to shift the burden of proof to her.

[¶ 18] Similarly, in *Sturgis v. State*, 932 P.2d 199, 205 (Wyo.1997), we concluded that, where a defendant chooses not to testify, but

chooses to introduce into evidence her earlier statement to police, "the door swings both ways, affording the prosecutor a similar opportunity to make some comment over what she said or neglected to say." As with the prosecutor's comments in *Helm*, this is not a comment upon the appellant's right not to testify. *Id.* We find no prosecutorial misconduct in the rebuttal closing argument.

### Did the district court abuse its discretion when it denied the appellant's motion to strike from the PSI the recommendations of the probation and parole agent who prepared it?

[¶ 19] Wyo. Stat. Ann. § 7–13–407(a)(ii) (LexisNexis 2007) requires state probation and parole agents to "[i]nvestigate all cases referred by any court ... and report to the court ... in writing[.]" One such investigation and report is the PSI mandated by W.R.Cr.P. 32(a) for all felony cases. The content of the report is dictated by W.R.Cr.P. 32(a)(2):

(2) Report.—The report of the presentence investigation shall contain:

(A) Information about the history and characteristics of the defendant, including prior criminal record, if any, financial condition, and any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in the correctional treatment of the defendant.

(B) *Verified information stated in a nonargumentative style containing an assessment of the financial, social, psychological, and medical impact upon, and cost to, any individual against whom the offense has been committed* and attaching a victim impact statement as provided in W.S. 7–21–103 if the victim chooses to make one in writing. In any event the report shall state that the victim was advised of the right to make such a statement orally at the defendant's sentencing or in writing. If the victim could not be contacted, the report shall describe the efforts made to contact the victim.

(C) Unless the court orders otherwise, information concerning the nature and extent of non-prison programs and resources available for the defendant; and

(D) Such other information as may be required by the court.

(Emphasis added.)

[¶ 20] The victim impact statement provided by Wyo. Stat. Ann. § 7–21–103 (LexisNexis 2007) "may include but shall not be limited to" the matters listed in Wyo. Stat. Ann. § 7–21–102(c):

. . . .

(i) An explanation of the nature and extent of any physical, psychological or emotional harm or trauma suffered by the victim;

(ii) An explanation of the extent of any economic loss or property damage suffered by the victim;

(iii) The need for and extent of restitution and whether the victim has applied for or received compensation for loss or damage; and

(iv) The victim's recommendation for an appropriate disposition.

[¶ 21] We have quoted these statutes and court rules at length to show the "victim impact" evidence that is to be made available to the sentencing judge, and to contrast the information that should be provided by the probation and parole agent with the information that may be provided by a victim.[3] In the instant case, the deceased victim's father and brother produced written statements that were included in the presentence investigation report, and the victim's mother testified at the sentencing hearing. The appellant did not object to any of those statements, and does not now appeal their inclusion in the sentencing process. She did, however, object to the following portion of the "Evaluation" section of the PSI written by the probation and parole agent, and she

---

**3.** Wyo. Stat. Ann. § 7–21–101(a)(iii) (LexisNexis 2007) defines "victim" to include family members of a minor victim.

filed an Objection and Motion to Strike Presentence Investigation Report:

> Madison Scalzo was not just someone else's child. She was a sweet young girl with big dreams and an even bigger heart. The silence that has now replaced her laughter will be a constant reminder to her family and loved ones that she is forever gone. The world will never know what Madison could have accomplished in her lifetime. All that she was and could have become was violently snuffed out by the reckless arrogance of a woman who made the self-involved *choice* to drive drunk.
>
> This Writer saved the following [Gillette] News–Record clipping from 10–24–07, in anticipation of this report, so as to impress upon the reader the personality, humanity and innocence of Madison (all of which instantly struck this Writer upon reading it). These words, written by Madison's family so soon after her death, will be the final thoughts in this report: "Our beautiful angel Madison was born on [D.O.B. omitted] in Alamosa, Colorado. Madison went to Pre–K school at Cottonwood Christian School in Alamosa, Colorado. In 2001, Madison moved to Gillette, Wyoming and enrolled in Wagonwheel Elementary. She loved getting Laffy Taffy from Mr. Dave Freeland, her favorite principal. Madison dearly loved all the teachers and staff members at the school. Madison was known for her kindness. She thought everyone should always be nice to each other. Growing up, Madison and her brother, Jasen, were inseparable. Madison enjoyed 'mothering' her younger brother, Gibson. Madison had a passion for playing basketball. She always strived to be the best ball player she could be. This past year, she started raising money to buy her own salon chair and dreamed of some day owning her own beauty salon—if she did not make it as a pop star and singer. To date, she had $80 saved for her chair. Madison was in swing choir at school. She had also attended many cheerleading camps. Madison loved Ladybugs and considered herself lucky every time she caught a live Ladybug. Lately, she took a liking to collecting frogs. She loved singing so much that, on family Karaoke nights, she would not let anyone else hold the microphone. Madison was not one to sit around; she was always on the go; from making iced coffee with mommy to going to church with daddy every Sunday. Madison was a 'giver.' Even in the event of her tragic death, some of her organs were given to someone special that was in need."

(Emphasis in original.)

[¶ 22] In her objection and motion to strike, the appellant contended that the above-quoted passage, rather than being informative and nonargumentative, was nonobjective and inflammatory. The motion was denied without a hearing, but with the following explanation:

> The court is going to deny the motion without argument as the court's review finds that the offending, alleged offending information that's in the evaluation and recommendation, which the court gives wide latitude to probation officers to make the recommendations and comments that they feel is appropriate. The rest of the report appears to be nonargumentative and verified and to the extent that it's not verified and we have questions about it we can correct those on the record today. So I'm going to enter an order denying the motion to strike the presentence investigation.

The appellant made no further objections in regard to the motion, and offered no additions, corrections, or explanations as to the report.

[¶ 23] Our standard for the review of alleged errors during sentencing is as follows:

> Sentencing decisions are normally within the discretion of the trial court. *Hamill v. State*, 948 P.2d 1356, 1358 (Wyo.1997). "A sentence will not be disturbed because of sentencing procedures unless the defendant can show an abuse of discretion, procedural conduct prejudicial to him, and circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Smith v. State*, 941 P.2d 749, 750 (Wyo. 1997). "An error warrants reversal only when it is prejudicial and it affects an

appellant's substantial rights. The party who is appealing bears the burden to establish that an error was prejudicial." *Candelaria v. State*, 895 P.2d 434, 439–40 (Wyo.1995) (citations omitted) [*overruled in part on other grounds by Allen v. State*, 2002 WY 48, 43 P.3d 551 (Wyo.2002)]; *see also Robinson v. Hamblin*, 914 P.2d 152, 155 (Wyo.1996).

*Lee v. State*, 2001 WY 129, ¶ 10, 36 P.3d 1133, 1138 (Wyo.2001). In respect to "erroneous" information contained in a PSI, we have said:

> Smith's contention of prejudice is not supported by any evidence that the court relied on the erroneous information, and, in fact, is contradicted by the sentencing judge's accepting his corrections and then imposing a sentence less than that agreed to by Smith in his plea agreement. *Wayt v. State*, 912 P.2d [1106], 1109 [ (Wyo. 1996) ] (appellant bears the burden of establishing this reliance). Nor do we find that sentencing Smith after learning of the report's severe deficiencies and without ordering a new report is improper and requires remanding for a new sentencing hearing. A sentencing judge's discretion permits him to order a new report or simply to accept corrections and proceed, as the judge did in this case. See *Mehring v. State*, 860 P.2d 1101, 1117–18 (Wyo. 1993). As for Smith's request that we set standards to ensure accurate, nonargumentative presentence reports, our standard of judicial discretion accomplishes this objective while giving the sentencing judge the greatest amount of flexibility to exercise the appropriate action towards these kinds of transgressions by the State.

*Smith v. State*, 941 P.2d 749, 750 (Wyo.1997). We have also declined to reverse a criminal conviction where the appellant has failed to prove that the district court relied on the allegedly erroneous or inflammatory comments of the probation and parole agent, where the writer's comments "merely summarized what was apparent elsewhere in the report and provided the rationale for the agent's sentencing recommendation." *Doherty v. State*, 2006 WY 39, ¶ 34, 131 P.3d 963, 974 (Wyo.2006) (quoting *Janssen v. State*, 2005 WY 123, ¶ 18, 120 P.3d 1006, 1011 (Wyo.2005)).

[¶ 24] Applying this very broad discretionary test, we cannot say that the district court abused its discretion in denying the motion to strike. We do so less from approbation of the probation and parole agent's comments, which we find extreme to say the least, than from these facts: (1) there has been no showing that the district court relied upon the comments in deciding upon a sentence; (2) the comments basically repeated what was already contained in the victim impact portion of the report and in the mother's statements in court at sentencing; and (3) the sentence imposed was less than that requested by the State, which suggests that the court was not "inflamed" by the comments.[4] Under these circumstances, we cannot conclude that the appellant was prejudiced by the written comments of the probation and parole agent. At the same time, we would caution the writers of presentence investigation reports to limit those reports to the matters outlined in W.R.Cr.P. 32(a)(2). It certainly makes more sense not to cross the line than it does to cross the line and hope prejudice is not found to have resulted therefrom.

## CONCLUSION

[¶ 25] The district court did not abuse its discretion in not excusing certain jurors challenged for cause or in denying the appellant's motion for change of venue. Sufficient evidence in the record shows that the challenged jurors agreed to set aside any opinions they may have held, and to decide the case entirely upon the evidence produced in court, rather than upon pre-trial publicity. A venue change was not necessary because a local jury was seated without undue difficulty. The prosecutor's challenged statements in rebuttal closing argument did not constitute prosecutorial misconduct in that, rather than being comments upon the appellant's exercise of her right to remain silent, and rather than being an attempt to shift the burden of proof to the appellant, the com-

---

4. The State requested a sentence of incarceration for a period of 12 to 20 years. The district court sentenced the appellant to incarceration for a period of 8 to 16 years.

ments were responsive to arguments made by defense counsel in closing argument, or were appropriate comments upon the evidence that was presented in support of the appellant's theory of the case. Finally, the district court did not abuse its discretion in denying the appellant's motion to strike the presentence investigation report, or to strike from it allegedly argumentative and inflammatory comments of the writer. It has not been shown that the district court relied upon those comments or that the appellant was in any way prejudiced by their inclusion in the PSI. We affirm.