# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 66

**APRIL TERM, A.D. 2020**

**May 29, 2020**

RANDY RAY PICKERING,

Appellant
(Defendant),

v.

S-18-0222, S-19-0151

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Fremont County*
*The Honorable Norman E. Young, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Professor Lauren McLane, Director; and Dana Blakeley, Student Intern, of the Defender Aid Clinic, University of Wyoming, College of Law.  Argument by Mr. Blakeley.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Timothy P. Zintak, Assistant Attorney General.  Argument by Mr. Zintak.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]    Randy Ray Pickering appeals his convictions on three counts of second-degree attempted murder, thirteen counts of aggravated assault and battery, and one count of interference with a peace officer.  He raises six issues on appeal arguing: (1) his rights to equal protection were denied when two potential jurors were peremptorily challenged based on race; (2) his constitutional right to an impartial jury was violated when the district court failed to conduct in-chambers questioning of jurors on their exposure to pretrial publicity about the case; (3) the district court abused its discretion when it denied his motion for continuance; (4) he received ineffective assistance of counsel based on failures to thoroughly investigate, call a bullet trajectory expert, and call a mental health expert; (5) there was insufficient evidence that he acted "maliciously" under the attempted second-degree murder charges or that he made an actual threat under the aggravated assault and battery charges; and (6) the cumulative effect of these errors warrants reversal.  We affirm.

## ISSUES

[¶2]    The issues are:

1.  Did the district court clearly err when it allowed the State to exercise peremptory challenges to exclude two minority jurors from the venire?

2.  Did Mr. Pickering lose his right to a fair trial when the district court refused to query individual jurors about pretrial publicity in chambers?

3.  Did Mr. Pickering's trial counsel provide ineffective assistance?

4.  Did the district court abuse its discretion when it denied Mr. Pickering's pretrial motion to continue the trial?

5.  Did the district court err when it denied Mr. Pickering's motion for judgment of acquittal?

6.  Did cumulative error deprive Mr. Pickering of a fair trial?

## FACTS

[¶3]    On March 22, 2017, the Riverton Police Department, with the assistance of the Fremont and Natrona County Sheriffs' Departments, arranged to arrest Mr. Pickering on

several outstanding warrants. The plan was to wait outside Mr. Pickering's residence until his girlfriend left for work and then arrest Mr. Pickering. In anticipation, several teams of officers surrounded the residence. Mr. Pickering's girlfriend never left, and the officers devised another plan to get Mr. Pickering's girlfriend out of the house—phoning to say her father was in the hospital. This plan also failed. Officers then tried to negotiate with Mr. Pickering.

[¶4] Mr. Pickering, who was carrying a handgun, was outside when additional officers in armored vehicles arrived. He retreated to the porch. He held the gun to his head and over a prolonged period paced in and out of the residence, yelling at the officers to leave him alone, and warning that he would shoot himself. Sergeant Scott Komrs testified that Mr. Pickering "flag[ged] or point[ed]" the gun toward the officers as he was yelling.

[¶5] After many hours, the officers heard banging from inside the home. The officers were aware that a gun safe, containing two heavy magazine-fed rifles, was in the master bedroom. They believed Mr. Pickering was attempting to access that gun safe. The "Blue Team" (Sergeant Komrs, Officer Scott Christoffersen, and Detective Jacob Nation) was tasked with thwarting any such attempt. They planned to break the master bedroom window and use gas to force Mr. Pickering out of the room. Detective Nation broke the window, and immediately heard a rapid succession of gunshots coming toward the team from inside the house. The team retreated.

[¶6] Sergeant Komrs estimated that six to twelve rounds were fired. He testified that it sounded as if rounds were "cracking over [the Blue Team's] head[s]." As the team pulled back, Detective Nation indicated he had been hit by what he thought was a ricocheting bullet. Bullets struck near two other law enforcement teams stationed in the area.[1]

[¶7] After these and other shots were fired, law enforcement continued to try to negotiate Mr. Pickering's surrender. Officers ultimately set off large amounts of non-

---

[1] One team was stationed on a nearby hill. Deputy Anthony Armstrong testified that he heard a bullet ricochet near him. Sergeant Arnie Zertuche testified that a bullet struck a wire fence and ricocheted, landing five to seven yards to his right. Deputy Bruce Erlandson stated that he heard a bullet ricochet past his location. Deputy Michael Deyo testified he "could hear the roar of a bullet go past us" and it "whirr[ed]" between him and Deputy Erlandson. Lieutenant Wesley Romero testified that he heard one of the shots "hitting . . . where the other guys were positioned on the hill." Deputy Charles Foutz testified he heard a bullet pass him to his left.

A third team, the "Red Team" (Sergeant Amy Fyler, Sergeant Peter McCall, Officer Ryan Wangberg, and Officer Tyler Larsen), testified that they heard shots from the house passing in their area. Officer Larsen heard "a bullet fly overhead." Officer Wangberg heard a gunshot within "a very close vicinity." Sergeant Fyler testified she heard a noise that sounded like a long gun shooting past her which she "perceived to be a bullet flying in a close proximity."

lethal gas in the house, causing Mr. Pickering and his girlfriend to exit the home. Mr. Pickering surrendered.

[¶8] Mr. Pickering was charged with three counts of attempted second-degree murder under Wyo. Stat. Ann. §§ 6-2-104 and 6-1-301(a)(i) (Blue Team officers were alleged victims). He was charged with thirteen counts of aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii) (all attending officers were alleged victims). He was charged with one misdemeanor count of interference with a peace officer under Wyo. Stat. Ann. § 6-5-204(a). A jury convicted Mr. Pickering of all charges. He was sentenced to twenty to thirty years in prison on the attempted murder counts and eight to ten years on each of the aggravated assault and battery counts, with all sentences running concurrently. The six-month misdemeanor interference with a police officer sentence was deemed discharged by pretrial detention. Mr. Pickering appealed (Appeal No. S-18-0222).

[¶9] Mr. Pickering filed a W.R.A.P. 21 motion, seeking a new trial based on ineffective assistance of counsel. The district court denied the motion and Mr. Pickering appealed that denial (Appeal No. S-19-0151). We consolidated the appeals. Additional facts are discussed as they are relevant to our analysis.

*DISCUSSION*

**I.** ***Did the district court clearly err when it allowed the State to exercise peremptory challenges to exclude two minority jurors from the venire?***

**A. Facts Regarding Voir Dire—the *Batson* Challenge**

[¶10] During jury selection, the State peremptorily challenged two jurors—Juror 447 and Juror 493—who may have been Hispanic. The defense objected arguing that under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct 1712, 90 L.Ed.2d 69 (1986), *holding modified by Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), there was no basis for the strikes other than race. In support of its position, the defense argued that neither juror had spoken during voir dire and that these two jurors were the only minorities on a panel of thirty-one potential jurors. The district court found the defense had made prima facie showing that the State exercised the peremptory challenges based on race. The court then looked to the State to provide a non-discriminatory reason for these peremptory strikes. The State also argued that neither juror spoke during voir dire, but maintained that the failure to speak was a race-neutral basis for its strikes. The State noted that both jurors' questionnaires were "barebones" with "very little minimum information." The State did not question these jurors.

[¶11] After hearing argument, the district court stated:

3

All right. . . . the explanation of the State need not be persuasive or even plausible. All that is required is an explanation that is facially valid. And I find the State's explanation to be facially valid.

Now, I believe [the defense has] the burden of going forward with something more to convince the Court that it's racially motivated.

Defense counsel responded, "I have nothing more at this time." The court inquired whether anyone had "[a]nything else for the record" and then moved to another issue. Both jurors remained stricken from the panel.

[¶12] Mr. Pickering argues that the district court erred when it denied his *Batson* challenge to the State's peremptory strikes of two alleged Hispanic jurors. The district court's findings were unclear, and we remanded the matter for additional findings and briefing. In its supplemental order, the district court found that Mr. Pickering had not proven purposeful discrimination and denied his *Batson* challenge. In his supplemental brief, Mr. Pickering reasserts his argument that the district court erroneously denied his *Batson* challenge and contends that a full remand is required.

## B. Standard of Review

[¶13] A district court's *Batson* determination on discriminatory intent will be overturned only if the determination was clearly erroneous. *Roberts v. State*, 2018 WY 23, ¶ 13, 411 P.3d 431, 437 (Wyo. 2018) (citing *Mattern v. State*, 2007 WY 24, ¶ 9, 151 P.3d 1116, 1122 (Wyo. 2007); *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)). A clear error review of a *Batson* ruling must examine all circumstances bearing upon whether intentional discrimination motivated the challenges. *Foster v. Chatman*, 578 U.S. ____, ____, 136 S.Ct. 1737, 1748, 195 L.Ed.2d 1 (2016).

## C. Analysis

[¶14] The United States Supreme Court has recognized that discrimination in jury selection violates the defendant's and potential jurors' equal protection rights and is unconstitutional. *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718; *Foster*, 578 U.S. at ____, 136 S.Ct. at 1747; *Roberts*, ¶ 12, 411 P.3d at 437. *Batson* and its progeny prohibit using peremptory challenges to excuse potential jurors based on race.[2] *Batson*, 476 U.S. at 89,

---

[2] The United States Supreme Court has allowed *Batson* challenges where jurors have been struck based on their race, *see Batson*, 476 U.S. 79, 106 S.Ct. 1712 (Black juror); *Hernandez*, 500 U.S. 352, 111 S.Ct. 1859 (Hispanic juror); and gender, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128

106 S.Ct. at 1719 (race); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994) (gender); *see also Roberts*, ¶ 12, 411 P.3d at 437.

[¶15] When a defendant claims that the State has removed a potential juror for a discriminatory purpose, the law requires the district judge to conduct a three-step inquiry. *Batson*, 476 U.S. at 89, 106 S.Ct. at 1719.

> **First**, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; **second**, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and **third**, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster*, 578 U.S. at ____, 136 S.Ct. at 1747 (emphasis added) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476–77, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008)); *see also Roberts*, ¶ 13, 411 P.3d at 437.

### Step 1: Establishing a Prima Facie Case

[¶16] To establish a prima facie case, the challenger must "show[] that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94, 106 S.Ct. at 1721; *see also Cooper v. State*, 432 P.3d 202, 204 (Nev. 2018). A prima facie case may be made "with proof of systematic exclusion of that racial group from juries over time, or with proof that the facts of the particular case show purposeful racial discrimination." *Mattern*, ¶ 8, 151 P.3d at 1121–22 (citing *Batson*, 476 U.S. at 93–97, 106 S.Ct. at 1721–23).[3] "Other evidence . . . could include the disproportionate effect of peremptory strikes, the nature of the proponent's questions and statements during voir dire, disparate treatment of members of the targeted group, and whether the case itself is sensitive to bias." *Williams v. State*, 429 P.3d 301, 306 (Nev. 2018) (citation and internal quotation marks omitted). "This showing is not onerous, nor does it require the

---

L.Ed.2d 89 (1994) (female jurors). Lower courts have extended *Batson*. *See, e.g.*, *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987) (Native Americans); *Roman v. Abrams*, 822 F.2d 214 (2d Cir. 1987) (Whites); *United States v. Gelb*, 881 F.2d 1155 (2d Cir. 1989) (Jews); *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988) (Italians); *United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992), *overruled by United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (socioeconomic status).
[3] The *Mattern* Court also stated that to make a prima facie showing, the challenging party must be a "member of a racial group capable of being singled out for differential treatment." *Mattern*, ¶ 8, 151 P.3d at 1121–22 (citation omitted). This requirement was rejected by the Supreme Court in *Powers*, 499 U.S. at 415, 111 S.Ct. at 1373. The challenging party is no longer required to be the same race as the eliminated juror to establish a prima facie case in a *Batson* challenge.

[challenger] to meet the ultimate burden of proof." *Id.* The challenger "is entitled to rely on the fact that peremptory challenges . . . enable[] discrimination by those who wish to discriminate." V. Hale Starr & Mark McCormick, *Jury Selection* § 2.13[B][2], at 2-32 (4th ed. 2013); *see also Roberts*, ¶¶ 11–13, 411 P.3d at 436–37 (peremptory challenges are "often exercised upon . . . sudden impressions and unaccountable prejudices" (citation and internal quotation marks omitted)).

## Step 2: Race-Neutral Explanation

[¶17]   If the challenging party establishes a prima facie case, the respondent must proffer a race-neutral explanation for the use of peremptory strikes. The reasons given "need not rise to the level justifying exercise of a challenge for cause," *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, but there must be a "clear and reasonably specific" explanation of "legitimate reasons" for the strike. *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)). *See Mattern*, ¶ 8, 151 P.3d at 1122 ("While such neutral explanation need not rise to the level of justifying a challenge for cause, it must go beyond the assumption that a juror . . . would not be impartial, and it must be related to the particular facts of the case." (citing *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24)). Stated differently:

> To satisfy the second step of the *Batson* analysis, the prosecutor simply must provide "an explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866. The explanation "need not be persuasive, or even plausible. . . . [A]ll that is required is an explanation that is facially valid." *Mattern*, 2007 WY 24, ¶ 9, 151 P.3d at 1122 (citing *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam)). A venireperson's demeanor is one such valid, race-neutral explanation for exercising a peremptory strike. *Snyder*, 552 U.S. at 477, 128 S.Ct. at 1208. A prosecutor may validly strike a venireperson who appears to be disinterested in serving on the jury. *Beartusk v. State*, 6 P.3d 138, 142 (Wyo. 2000).

*Roberts*, ¶ 15, 411 P.3d at 437–38. The strength of the race-neutral explanation is questioned at "the third step—where the judge is called upon to determine whether the defendant has carried his burden of proving purposeful discrimination—[where] the judge must choose whether to believe or disbelieve the State's explanation." *Mattern*, ¶¶ 8–9, 151 P.3d at 1122.

## Step 3: Determining Whether the Objecting Party Proved the Striking Party Exercised Peremptory Challenges with a Discriminatory Purpose

[¶18]  In the final step, "the essence of the *Batson* analysis," the district court must determine whether the defendant has proven purposeful discrimination.  *Roberts*, ¶ 17, 411 P.3d at 438.  The decisive question is "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869.  The district court "must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and "consider all relevant circumstances" before ruling on a *Batson* objection.  *Batson*, 476 U.S. at 93, 96, 106 S.Ct. 1721, 1723 (internal citation and quotation marks omitted).

[¶19]  The court

> must keep in mind the fundamental principle that . . . "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."
>
> *Hernandez*, 500 U.S. at 359–60, 111 S.Ct. at 1866 (internal citations omitted).

*Roberts*, ¶ 17, 411 P.3d at 438.

[¶20]  "A trial court's determination of discriminatory intent 'largely will turn on evaluation of credibility.'"  *Id.* ¶ 18, 411 P.3d at 438 (citing *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869 (quoting *Batson*, 476 U.S. at 98 n.21, 106 S.Ct. at 1724 n.21)).  Some evidence of credibility may appear in the transcript.  For example, "[c]redibility can be measured by, among other factors, . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."  *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 1040, 154 L.Ed.2d 931 (2003).  Additionally, "[i]f a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [non-minority juror] who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ."  *Mattern*, ¶ 9, 151 P.3d at 1122 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)).  Perhaps the "best evidence [of credibility] often will be the demeanor of the attorney who exercises the challenge."  *Beartusk v. State*, 6 P.3d 138, 143 (Wyo. 2000) (citing *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869); *Roberts*, ¶ 19, 411 P.3d at 438.

[¶21] The "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869 (internal citations and quotation marks omitted); *see also Beartusk*, 6 P.3d at 143. *Batson* requires the district court to "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and "consider all relevant circumstances" before ruling on a *Batson* objection. *Batson*, 476 U.S. at 93, 96, 106 S.Ct. at 1721, 1723 (internal citation and quotation marks omitted).

## D.    Application to This Case

### 1.  Prima Facie Case

[¶22]  Here, in its supplemental order, the district court expressed reservations about whether Mr. Pickering established a prima facie case of racial discrimination:

> [O]ther than simply asserting that [Jurors 447 and 493] were racial minorities based upon their look and last names [Mr. Pickering] provided no information or showing that these jurors were racial minorities.
>
> .    .    .
>
> [T]he Court was and still is extremely reluctant . . . to find that [Mr. Pickering] satisfied his *prima facie* showing that the prosecutors' exercised their peremptory challenges on Jurors 447 and 493 on the basis of race.  This is so because the racial status of the prospective Jurors was essentially unknown. [Mr. Pickering's] challenge and resulting discussion among the Court and counsel was an awkward attempt to assign racial status based solely on name and outward physical appearance.  As [Mr. Pickering] himself demonstrates, name and appearance do not define, demonstrate or determine a person's racial status or identity.[4]

The district court concluded "out of an abundance of caution" that Mr. Pickering satisfied the "bare minimum" required for a prima facie showing.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  *Roberts*, ¶ 14, 411 P.3d at

---

[4] Mr. Pickering is part Native American.

437 (citing *Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866). We turn to the second step of the *Batson* analysis.

## 2. Race-Neutral Explanation

[¶23] The district court found the State had established a race-neutral explanation for exercising its peremptory challenges to Jurors 447 and 493. It explained, "the prosecutors[] argued that their exercise of peremptory challenges on Jurors 447 and 493 was based solely on the fact that very little was known about these prospective jurors . . . [they] said nothing, or virtually nothing, during the *voir dire* process and were therefore unknowns." The district court found that the State's justification was "unrelated to the race" of the jurors and was race neutral.

## 3. Purposeful Discrimination

[¶24] The State argued its challenge was based on the jurors' silence and their sparse questionnaires.[5] Mr. Pickering counters that it was incumbent upon the State to ask questions and without questioning, the State cannot use lack of information to establish a race-neutral reason for the strike. A prospective minority juror's failure to speak, alone, may not be enough to overcome a *Batson* challenge, especially when the State could rectify the problem by asking some questions.[6] Here, the failure to speak was buttressed

---

[5] The record is incomplete regarding jury selection. The record does not include juror questionnaires, or the district court's list of panel members.

[6] Courts in other jurisdictions have considered whether the failure of a juror to speak was a sufficient race-neutral explanation to overcome a *Batson* challenge. Some of those courts have held that a juror's failure to speak when the prosecution failed to question them is proof of purposeful discrimination. *See, e.g.*, *Morrison v. Jones*, 952 F. Supp. 729, 733 (M.D. Ala. 1996) (when prosecution "asked virtually no questions of black venire members" it had "no information that could possibly support or suggest a race-neutral reason for their exclusion"; defendant established purposeful discrimination); *Fernandez v. State*, 746 So. 2d 516, 517–18 (Fla. Dist. Ct. App. 1999) ("the trial court should not have accepted the prosecutor's stated reason for striking [juror], which . . . was a lack of information . . . . An attorney cannot decline the opportunity to question a prospective juror, then use the lack of information caused by this failure as a reason to support her or his peremptory challenge. A perfunctory examination (or none) is indicative of a disingenuous or pretextual explanation for a challenge." (citing *State v. Slappy*, 522 So. 2d 18, 23 (Fla. 1988) ("the utter failure to question . . . challenged jurors on the grounds alleged for bias . . . renders the state's explanation immediately suspect"))); *Burris v. State*, 748 So. 2d 332, 334 (Fla. Dist. Ct. App. 1999) (if the state had been genuinely interested in a juror's ability to understand the proceedings, the state would have sufficiently explored the subject with her); *Overstreet v. State*, 712 So. 2d 1174, 1177 (Fla. Dist. Ct. App. 1998) (a perfunctory or cursory examination of a potential juror as to her uncertainty about accepting testimonial evidence was insufficient); *Haile v. State*, 672 So. 2d 555, 556 (Fla. Dist. Ct. App. 1996) (the utter failure to question a potential juror about the subject matter forming the basis of the strike was a source of immediate suspicion). At least one court, however, has held that a juror's failure to answer questions, combined with the prosecution's opinion that she was not paying attention, was a sufficient race-neutral justification for the exercise of a peremptory strike. *United States v. Walton*, No. 08-4797, 430 F. App'x 141, 146, 2011 WL 2199978 (3d Cir. June 7, 2011) (Latina juror

by additional findings. In its supplemental order, the district court analyzed the credibility of the State's counsel:

Having observed and considered the words, actions, arguments, and demeanor of the State's attorneys throughout the entire jury selection process, the Court FINDS there was nothing to indicate that the prosecution's exercise of peremptory challenges on Jurors 447 and 493 was done for a discriminatory purpose or with discriminatory intent. As previously noted, there was genuine uncertainty as to the actual racial status or identity of the prospective Jurors. When the *Batson* issue was raised the Court and parties addressed this delicate issue as best they could . . . . Regardless of the awkwardness and the limitations of this approach, it allowed the court to observe not only the words of the prosecutors[] but their demeanor. During that process, the Court did not observe anything that would indicate a discriminatory purpose or intent on the part of the State. The Court further recognizes that it was improbable for the State to exercise peremptory challenges based upon race when there was genuine uncertainty as to the racial status or identity of the prospective Jurors, and the Court observed nothing that would undermine that conclusion.

[¶25] The district court assessed the "nature and circumstances of the jury selection process." It concluded that the State's proffered explanation (that it knew very little about the jurors) for the peremptory challenges was "reasonable trial strategy." The court explained that it was "reasonable to avoid putting a prospective Juror onto the panel without having substantial information about the Juror[,] . . . especially so when, as here, there was more information available regarding the Jurors who would take the challenged Juror's place."

[¶26] The court also pointed out that the State's strategy of avoiding "unknowns" applied "equally to non-minority jurors." The State struck Juror 392; a non-minority juror who said very little. Finally, the court explained that the State did not strike two additional jurors, Juror 429 and 348, who answered questions during voir dire, but "who also may have been minorities."

---

struck because she did not answer any questions and prosecution did not think she was paying attention; *Batson* challenge denial was upheld on appeal). Either way, the inquiry is a fact-intensive one that rests with the discretion and expertise of the district court and cannot be raised for the first time on appeal.

[¶27] The district court conducted the "sensitive inquiry" a *Batson* challenge requires. Its analysis and conclusion are supported by the record.[7] It concluded that Mr. Pickering had not proven purposeful discrimination. The district court's finding that the peremptory challenges on Jurors 447 and 493 were not exercised for a discriminatory purpose is not clearly erroneous.

## II. Did Mr. Pickering lose his right to a fair trial when the district court refused to query individual jurors about pretrial publicity in chambers?

### A. Facts Regarding Voir Dire—Pretrial Publicity

[¶28] Two news articles are pertinent to this issue, one in *County 10*, and one in *The Sunday Ranger* (*Riverton Ranger*). The contents of the *County 10* piece do not appear in the record, but potential jurors who read the article noted it appeared about a year before trial and covered the events from the day of Mr. Pickering's arrest. The *Riverton Ranger* article is in the record on appeal, but was not before the district court during voir dire. It appeared in the local paper eight days prior to trial on March 11, 2018. The article, entitled "Attorneys contest evidence as Pickering trial nears," covered a pretrial hearing on the admissibility of W.R.E. 404(b) evidence related to Mr. Pickering's arrest warrants. The district court largely ruled that the prior acts were inadmissible at trial.[8] The article described the inadmissible evidence and discussed events leading up to Mr. Pickering's arrest. Potential jurors were questioned about the pretrial publicity. Of thirty-seven potential jurors, six had read the *Riverton Ranger* article, and seven had read the *County 10* piece.

[¶29] Juror 363 was the first juror to respond to questioning on the articles, stating she had formed a strong opinion that would preclude her from being fair. Immediately following her response, Mr. Pickering's counsel requested in-chambers voir dire of those jurors who had read the articles. The court ruled it would not do so "[y]et." The State, then, explained to the potential jurors that "[o]ne of the mandates of the law is to only take the evidence that is presented before you during the trial" and queried whether "everyone under[stood] that anything you read in the newspaper would not be evidence, that it cannot be considered as evidence in your deliberations?" Juror 363 responded that she "believe[d] people should take responsibility for their actions." The State asked Juror 363 whether she was "willing and able to listen to the evidence in this case as presented in court and deliberate and be a fair and impartial juror, with the evidence presented, only using the evidence presented at trial?" She responded, "I would say yes." All, except one

[7] Mr. Pickering argues in his supplemental brief that the case should be remanded, or in the alternative the court should hold an evidentiary hearing on the *Batson* issue, because the record was not fully developed and does not support the district court's findings regarding credibility.

[8] The admission of the State's 404(b) evidence is not an issue on appeal.

11

of the remaining jurors who had read the article, responded that they were "willing to only take into account the evidence that's presented at trial" during deliberations.[9]

[¶30] Juror 396 read the *Riverton Ranger* article and remembered it "very well." She indicated that she had formed an opinion based upon the article, but she could "take that out of [her] mind and determine the case purely on the evidence as it came forth in the courtroom." Later, she said she had closely followed the case and would "try [her] darndest" to set aside her knowledge of the details but it would be "very close." Juror 396 was dismissed for cause.

[¶31] Of the remaining jurors who had read one or both articles, Jurors 363, 497, 335, 383, 384, and 429 were peremptorily challenged. Jurors 358, 406, and 442 remained on the panel.

[¶32] Mr. Pickering argues that the district court abused its discretion when it did not individually question those jurors who had seen the *County 10* and/or the *Riverton Ranger* articles in chambers.

## B.     Standard of Review

[¶33] The parties dispute the applicable standard of review. The State argues plain error is the correct standard, and Mr. Pickering asserts abuse of discretion applies. The State contends Mr. Pickering failed to preserve the issue of individually questioning jurors in chambers because Mr. Pickering did not:

1. Move to excuse any juror for cause except Juror 396;
2. Move for a change in venue;
3. Make any other challenge to the jury's impartiality; or
4. Request any jurors (other than Juror 363) be questioned individually.

[¶34] The state's first three contentions are accurate. The fourth is not supported by the record. The first request for "in chambers" interviews included any potential juror who

---

[9] Jurors 497, 383, and 335 indicated that they had read the *Riverton Ranger* article. Juror 383 had read the *County 10* piece also. Juror 442 stated that he had read both the *County 10* and the *Riverton Ranger* articles and that he could "put those out of [his] mind and decide the case purely on the evidence" at trial. Jurors 429, 384, 358, and 406 read the *County 10* article. Juror 429 stated that he did not form any opinions when he read it and that he did "not really" remember it. He indicated that he would be able to put it out of his mind and consider only the evidence introduced at trial. Juror 384 stated that, in addition to reading the *County 10* article, he heard about the case on the radio, but that he did "[n]ot necessarily" form any opinions based on either the article or the radio and that he would be able to decide the case based solely upon the evidence presented at trial. Juror 406 indicated that he had "formed an opinion," but he would be able to fairly and impartially look at the facts.

12

had read the *County 10* and/or *Riverton Ranger* articles. The district court did not reject the request. When the State requested clarification of the Court's ruling—"So, we're not going to do [individualized voir dire]"—the court said, "Yet." Later, defense counsel renewed its request as to three potential jurors:[10]

> [DEFENSE COUNSEL]: I wonder, Judge, if we ought to take those three into chambers, question them individually. My understanding is [the *Riverton Ranger*] article laid out the 404(B), everything that was in the State's motion.
>
> . . .
>
> THE COURT: Well, they've been asked extensively about their reading of the newspaper. I have not seen the article myself. I have no idea what it says. I don't know how we would question them about it at this time. None of them have said that they can't set that aside, their knowledge of the case, and be fair and impartial jurors, so I'm not going to do that.

[¶35] Defense counsel did not challenge any of these three jurors for cause. The record does not reflect whether any of the three served on the panel. Here, Mr. Pickering does not challenge the service of any particular juror, rather, he asserts that voir dire was flawed because those jurors exposed to pretrial publicity were not examined in chambers.

[¶36] "We have previously established that failure to challenge a juror, and then later acceptance of the panel at trial, waives any objection to the service of a particular juror." *Benjamin v. State*, 2011 WY 147, ¶ 30, 264 P.3d 1, 9 (Wyo. 2011) (internal citation and quotation marks omitted). Even when a party challenges the selection of a juror during voir dire, but later "accept[s] the jury prior to presenting [his] case, [the] earlier objection . . . [will be] insufficient to preserve the issue for appeal." *Thomas v. State*, 958 P.2d 1059, 1061 (Wyo. 1998); *see also Munoz v. State*, 849 P.2d 1299, 1302 (Wyo. 1993). While here the challenge is to the process and not a particular juror, the analysis remains the same.

[¶37] In *Munoz*, defense counsel and the district court had the following exchange:

> [DEFENSE COUNSEL]: * * *
>
> Your Honor, I would pass the entire panel for cause.

---

[10] Defense counsel referred to those jurors as "the three people in the top row." The record does not indicate the names or numbers of those jurors.

> THE COURT: Very well.
>
> [DEFENSE COUNSEL]: Reserving, of course, my objections
> to the three previous [jurors].

*Munoz*, 849 P.2d at 1302. On appeal, we held that the defendant "waived his claim to reversible error with respect to his challenge . . . by passing the jury panel for cause." *Id.* By contrast, in *Castellanos*, defense counsel had challenged two jurors for cause and those challenges were rejected. *Castellanos v. State*, 2016 WY 11, ¶ 101, 366 P.3d 1279, 1305 (Wyo. 2016). Defense counsel made clear that because she had to exercise peremptory challenges for those jurors and could not use them for two other jurors who ended up on the panel, the defense "cannot accept the jury as a panel with this situation." *Id.* ¶ 101, 366 P.3d at 1305–06. This Court applied an abuse of discretion standard of review, implying that the issue was preserved. *Id.* ¶ 102, 366 P.3d at 1306.

[¶38] Here, defense counsel did not explicitly pass the jury for cause;[11] on the other hand, they did not object to the panel or renew their argument on individual questioning. Defense counsel, by accepting the jury, did not preserve their argument. *See Munoz* and *Castellanos*.

[¶39] Our review is for plain error. *Schwenke v. State*, 768 P.2d 1031, 1033 (Wyo. 1989) (where appellant challenged jurors for cause but accepted the jury as finally empaneled, review of "improprieties found in the jury selection process" is for plain error). "Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Brown v. State*, 2019 WY 102, ¶ 13, 450 P.3d 208, 211 (Wyo. 2019) (citations omitted).[12]

## C.    Analysis

---

[11] The defense explicitly passed the first panel for cause but only implicitly passed the second panel for cause.

[12] Even if our standard of review was abuse of discretion, Mr. Pickering would have to establish that he was prejudiced. In *Castellanos*, under an abuse of discretion review, we explained,

> where a challenge for cause of a juror is denied and a peremptory challenge is then used to dismiss the challenged juror:
>> . . . absent a showing of prejudice a defendant's use of peremptory challenge to cure a trial court's erroneous denial of a challenge for cause does not violate any statutory or constitutional right and cannot constitute reversible error.
>
> *Klahn* [*v. State*, 2004 WY 94,] ¶ 21, 96 P.3d [472,] 484 [(Wyo. 2004)].

*Castellanos*, ¶ 103, 366 P.3d at 1306.

[¶40]  The first step of plain error is met.  The record of voir dire is clear.  Mr. Pickering must next establish that the error he complains of transgresses a clear and unequivocal rule of law and finally that he was materially prejudiced.

[¶41]  Wyoming law regarding jury selection and potential jurors' exposure to pretrial publicity is clear and unequivocal.  However, we have found no clear and unequivocal rule of law requiring in-chambers examinations of potential jurors who have been exposed to pretrial publicity.  Criminal defendants in Wyoming have a constitutional right to a trial by an impartial jury.  Wyo. Const. art. 1, § 10.  During voir dire, prospective jurors are questioned for the "sole purpose of selecting 'a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.'"  *Carothers v. State*, 2008 WY 58, ¶ 4, 185 P.3d 1, 4 (Wyo. 2008) (quoting W.R.Cr.P. 24(c)(1)).  Jurors may be dismissed "for cause" if they are biased or prejudiced against the defendant, or if they have formed an opinion as to guilt.  Wyo. Stat. Ann. § 7-11-105(a)(ii), (b).

[¶42]  Wyo. Stat. Ann. § 7-11-106 specifically addresses juror exposure to news media:

> (a) It is not cause for challenge that a person called to act as a juror in a criminal case has formed or expressed an opinion as to the guilt or innocence of the accused from news media reports or rumor if:
>
> > (i) The prospective juror states that he can lay aside his impression or opinion and render a verdict based on the evidence presented in court; and
> >
> > (ii) The court is satisfied, from the examination of the prospective juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at trial.

Wyo. Stat. Ann. § 7-11-106 (LexisNexis 2019).  The test that courts "apply to determine if a prospective juror should be dismissed for cause is whether or not that juror would be able to render a fair and impartial verdict based upon the evidence adduced at trial and the court's instructions."  *Carothers*, ¶ 4, 185 P.3d at 4 (citations omitted).  "Even where a prospective juror has previously formed or stated an opinion as to the defendant's guilt, the ultimate question is whether the juror can set aside that opinion and impartially determine the case based upon the evidence."  *Id.* (citations omitted); *see also Nixon v. State*, 994 P.2d 324, 327–28 (Wyo. 1999) (last quoting *Amin v. State*, 811 P.2d 255, 258 (Wyo. 1991)).

[¶43]  Mr. Pickering argues that *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) governs.  In *Marshall*, the Supreme Court held that "persons who

15

have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced." *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975) (interpreting *Marshall*). However, *Marshall* limited its holding to federal cases, expressly stating that its holding was not a matter of "constitutional compulsion." *Murphy*, 421 U.S. at 797, 95 S.Ct. at 2035; *Marshall*, 360 U.S. at 313, 79 S.Ct. at 1173. The *Murphy* Court explicitly declined to apply *Marshall* to the states. *Murphy*, 421 U.S. at 798, 95 S.Ct. at 2035. Wyoming has not adopted the presumption of prejudice applied in *Marshall*.

[¶44] Wyoming requires the court and the parties to query a juror exposed to pretrial publicity regarding whether that exposure caused the juror to form an opinion and, if so, whether they can set that opinion aside and render a verdict based upon the evidence introduced and the court's instructions. *See supra* ¶ 41; *Carothers*, ¶¶ 12–13, 185 P.3d at 9 ("A fair and impartial jury was seated in this case when the requisite number of jurors, despite . . . substantial pre-trial publicity, declared . . . themselves able to determine the matter based solely upon the evidence . . . and the instructions.").

[¶45] We recognize that in cases involving juror exposure to prejudicial pretrial publicity, individual voir dire may be useful. No authority, however, has been brought to the attention of this Court, nor have we found any, *mandating* that individual voir dire be conducted under any particular circumstances. The ABA Standards for Criminal Justice 8-3.5 provides some guidance for questioning potential jurors about their exposure to publicity:

> (a) **If there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to exposure should take place outside the presence of other chosen and prospective jurors.** An accurate record of this examination should be kept by a court reporter or tape recording whenever possible. The questioning should be conducted for the purpose of determining what the prospective juror has read and heard about the case and how any exposure has affected that person's attitude toward the trial, not to convince the prospective juror that an inability to cast aside any preconceptions would be a dereliction of duty.[13]

---

[13] The standard continues:

> (b) Whenever prospective jurors have been exposed to potentially prejudicial material, the court should consider not only the jurors' subjective self-evaluation of their ability to remain impartial but also the objective nature of the material and the degree of exposure. **The court**

Standards for Criminal Justice, Selecting the Jury § 8-3.5(a) (Am. Bar Ass'n 2013) (emphasis added). Other courts presented with the issue of individual questioning of jurors about exposure to pretrial publicity have recognized that the trial courts have discretion. *See, e.g.*, *State v. Bush*, 423 P.3d 370, 379 (Ariz. 2018), *cert. denied*, \_\_\_\_ U.S. \_\_\_\_, 139 S.Ct. 1546, 203 L.Ed.2d 747 (2019) ("We review a trial court's rulings on *voir dire* of prospective jurors for abuse of discretion . . . and necessarily defer largely to a trial court's 'sound discretion' in such matters." (citations omitted)); *Luong v. State*, 199 So. 3d 139, 156 (Ala. 2014), *as modified on denial of reh'g* (May 23, 2014); *Commonwealth v. Clemente*, 893 N.E.2d 19, 45 (Mass. 2008) ("we have granted trial judges 'wide discretion' in dealing with publicity that might have a prejudicial effect on jurors" (citation omitted)); *Driskell v. State*, 659 P.2d 343, 356–57 (Okla. 1983); *Dudley v. State*, No. CACR 86-57, 1986 WL 7035, at *2 (Ark. Ct. App. June 25, 1986); *State v. Koch*, 426 N.W.2d 586, 590–91 (Wis. 1988). Factors that bear on that decision include the nature and extent of the pretrial publicity, the length of time between the publicity and the trial, the general attitude of the community toward the crime and/or the defendant, whether the pretrial publicity has been made part of the record for the trial court's review, and the extent to which potential jurors indicated they could decide the case impartially based upon the evidence presented at trial. *See, e.g.*, *Barrera v. State*, No. 11-16-00332-CR, 2018 WL 3469550, at *2–3 (Tex. App. July 19, 2018) (similar factors in assessing prejudicial effect of pretrial publicity for change of venue); *Luong*, 199 So. 3d at 156 ("Individual voir dire is required only when there is an indication that the assurances of the seated jurors that they could put aside what they had read or heard and render a fair verdict based on the evidence are not genuine.").

[¶46] Here, the pretrial publicity was limited to two articles. While neither was part of the record at the time of voir dire, the district court and counsel asked jurors who had been exposed to the articles and whether they could set aside any opinions and decide the case based upon the evidence. *See supra* ¶¶ 28–30. Apart from Juror 396, who was dismissed for cause, all the jurors who had seen the articles averred that they could decide

---

**should exercise extreme caution in qualifying a prospective juror who has either been exposed to highly prejudicial material or retained a recollection of any prejudicial material.**

(c) Whenever there is a substantial likelihood that, due to pretrial publicity, the regularly allotted number of peremptory challenges is inadequate, the court should permit additional challenges to the extent necessary for the impaneling of an impartial jury.

(d) Whenever it is determined that potentially prejudicial news coverage of a criminal matter has been intense and has been concentrated in a given locality in a state (or federal district), the court should, in jurisdictions where permissible, consider drawing jurors from other localities in that state (or district).

Standards for Criminal Justice, Selecting the Jury § 8-3.5(b)–(d) (Am. Bar Ass'n 2013) (emphasis added).

the case based on the evidence at trial and the court's instructions. Mr. Pickering has not demonstrated that this process violated a clear and unequivocal rule of law. Further, he has not shown that he suffered prejudice as a result of the district court's failure to question jurors in chambers. Mr. Pickering has not explained how voir dire would have been different had the jurors been questioned in chambers, nor has he explained how the composition of the jury would have changed. Mr. Pickering has not shown plain error.

### III. Did Mr. Pickering's trial counsel provide ineffective assistance?

[¶47] Mr. Pickering appeals the district court's denial of his motion for a new trial under Rule 21 of the Wyoming Rules of Appellate Procedure, which allows a new trial when defense counsel is ineffective. W.R.A.P. 21(a).

[¶48] In his Rule 21 motion, Mr. Pickering based his ineffective assistance claim on defense counsels' "failure to fully investigate the need for" expert witnesses and their failure to hire those experts. Mr. Pickering argued specifically that trial counsel were deficient when they did not hire a bullet trajectory expert or a mental health expert.

[¶49] On appeal, Mr. Pickering frames his ineffective assistance claims slightly differently. He contends trial counsel were ineffective when: (1) they failed to conduct a reasonable investigation by not interviewing the officers/victims which resulted in the failure to retain experts and the omission of a request for a lesser-included offense instruction; (2) they did not retain a mental health expert; and (3) they did not call a bullet trajectory expert.

### A. Waiver in W.R.A.P. 21 Appeals

[¶50] The State argues that Mr. Pickering's assertions that his attorneys were ineffective for not interviewing the officers/victims and for not proposing a lesser-included offense instruction are precluded from review because he failed to raise these issues in his Rule 21 motion before the district court. The State cites *Larkins v. State*, 2018 WY 122, ¶ 83, 429 P.3d 28, 47 n.13 (Wyo. 2018) and *Starr v. State*, 2017 WY 61, ¶ 14, 395 P.3d 180, 183–84 (Wyo. 2017) in support of its contention.

[¶51] In a footnote in *Larkins*, we explained that Mrs. Larkins did not raise an issue regarding joinder in her Rule 21 motion, and the district court did not address the issue as it pertained to Mrs. Larkins. On appeal, we noted that this could be grounds to preclude review. *Larkins*, ¶ 83, 429 P.3d at 47 n.13 (citing *Starr*, ¶ 14, 395 P.3d at 183–84). The *Larkins* case references *Starr*, where we stated:

> Mr. Starr argues here that because his trial counsel's theory of
> defense at trial was "accident," that trial counsel should have
> requested an instruction that discussed "accident" as a

defense. Though Mr. Starr's appellate counsel did not include this argument in her written Rule 21 motion, she orally argued in its support at the Rule 21 motion hearing. Under Rule 21, "[a]ny claims of ineffectiveness not made *in the motion* shall not be considered by the trial court unless the trial court determines that the interests of justice or judicial efficiency require the consideration of issues not specifically indicated in the motion." W.R.A.P. 21(a) (emphasis added). The district court concluded that appellate counsel's decision not to include this argument in her written motion was fatal, despite having access to the entire trial record at hand, precluded it from considering this argument for the first time at hearing. Accordingly, this Court is also precluded from considering this argument on appeal.

*Starr*, ¶ 14, 395 P.3d at 183–84.

[¶52] Rule 21(a) sets forth the procedure for filing a motion claiming ineffective assistance of counsel in the trial court. The motion must:

> contain nonspeculative allegations of facts which, if true, could support a determination that counsel's representation was deficient and prejudiced the appellant. *Any claims of ineffectiveness not made in the motion shall not be considered by the trial court unless the trial court determines that the interests of justice or judicial efficiency require the consideration of issues not specifically indicated in the motion.*

W.R.A.P. 21(a) (emphasis added). "If trial court denies the motion, [the] appellant may file a notice of appeal to challenge the trial court's order denying the motion." W. R.A.P. 21(e).

[¶53] The district court in *Starr* relied on W.R.A.P. 21(a) to conclude that appellate counsel's failure to raise the issue *in the district court* precluded the *district court* from addressing it. We held that because the issue was precluded in the trial court, it was precluded on appeal. *Id.* ¶ 14, 395 P.3d at 183–84.

[¶54] A Rule 21 motion is not mandatory and an evidentiary hearing before the district court is not required for an appellant to raise ineffective assistance claims on appeal to this Court. *See* W.R.A.P. 21(d); *see also Jacobsen v. State*, 2012 WY 105, ¶ 11, 281 P.3d 356, 359 (Wyo. 2012). Appellants can raise arguments regarding ineffectiveness for the first time on appeal. For example, in *Weston v. State*, 2019 WY 113, 451 P.3d 758 (Wyo.

2019), we considered the appellant's ineffective assistance claim on direct appeal, where there had been no Rule 21 motion and no Rule 21 evidentiary hearing. *See also Bittleston v. State*, 2019 WY 64, 442 P.3d 1287 (Wyo. 2019) (ineffective assistance claim heard on direct appeal); *Galbreath v. State*, 2015 WY 49, 346 P.3d 16 (Wyo. 2015) (ineffective assistance heard on direct appeal); *Floyd v. State*, 2006 WY 135, 144 P.3d 1233 (Wyo. 2006) (considering ineffective assistance where issue was a term of a conditional plea).

[¶55]   Here, unlike *Starr*, where the district court held issues not raised in the defendant's Rule 21 motion were precluded from consideration by that court, Mr. Pickering raises two issues that he did not present to the district court.  Mr. Pickering's failure to raise two issues (not interviewing the officers/victims and not proposing a lesser-included offense instruction) in his Rule 21 motion before the district court does not constitute a waiver of those issues.  We will consider them as if they were before us on direct appeal.  A Rule 21 motion is not a prerequisite to an appeal.  If a defendant can raise an ineffective assistance claim for the first time on direct appeal, he is not precluded from raising it for the first time on an appeal in cases where there was a Rule 21 motion and his claim was not raised in the motion.

[¶56]   We recognize that the evidence developed at a Rule 21 motion hearing in the district court is helpful to an ineffective assistance claim.  The failure to introduce such evidence might hamper an appellant's argument before this Court.  *See, e.g.*, *Bittleston*, ¶ 34, 442 P.3d at 1296 n.8 ("Because a W.R.A.P. 21 hearing was not requested below, the facts surrounding the traffic stop and interrogation, and counsel's decision to forego a suppression motion, were not fully fleshed out.  We therefore would have been somewhat constrained in our ability to evaluate Mr. Bittleston's claim of deficient performance if that were necessary.").  As a matter of practice, we strongly recommend that ineffective assistance arguments be raised and facts developed in the trial court.[14]   However, the failure to do so will not necessarily be fatal.

**B.**    **The Rule 21 Hearing**

[¶57]   At the Rule 21 evidentiary hearing, Mr. Pickering presented the testimony of three witnesses: 1) lead trial counsel; 2) assistant counsel; and 3) forensic psychologist, Dr. Maximillian Wachtel.  The district court found that Mr. Pickering failed to show how lack of time to prepare for trial impacted his attorneys' performance so that his trial was fundamentally unfair or that there was a reasonable possibility the outcome would have

---

[14] We can envision circumstances where the facts underlying an ineffective assistance argument might be fully developed on the record.  Under such circumstances, appellate counsel might determine the best strategy would be to raise those arguments directly with the Wyoming Supreme Court and not with the district court first.

been different. The district court further found that no evidence had been introduced to show that a ballistics expert was available and would have testified consistently with Mr. Pickering's theory. Finally, the court found that absent the assertion of a not guilty by reason of mental illness (NGMI) defense, testimony regarding Mr. Pickering's mental condition would not have been admissible.

## C. Standard of Review

[¶58] "Claims of ineffective assistance of counsel involve mixed questions of law and fact." *Galbreath*, ¶ 4, 346 P.3d at 18 (citation omitted). "This Court defers to a district court's factual findings unless the appellant establishes that they are clearly erroneous. However, we review the district court's legal conclusion on whether trial counsel was constitutionally ineffective de novo." *Larkins*, ¶ 61, 429 P.3d at 43 (citations omitted).

## D. Analysis

[¶59] The right to effective assistance of defense counsel is guaranteed by the Sixth Amendment to the United States Constitution and Article 1, § 10 of the Wyoming Constitution. In reviewing claims of ineffective assistance of counsel, we apply the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Galbreath*, ¶ 5, 346 P.3d at 18. To prevail, an appellant must demonstrate, first, that trial counsel's performance was constitutionally deficient, and second, that the deficient performance prejudiced the defense. *Id.*; *McGarvey v. State*, 2014 WY 66, ¶¶ 13–14, 325 P.3d 450, 454–55 (Wyo. 2014).

[¶60] To show that trial counsel's performance was constitutionally deficient, the appellant must establish that the attorney's performance was substantially below that of a reasonably competent attorney. *Bruckner v. State*, 2018 WY 51, ¶ 15, 417 P.3d 178, 181–82 (Wyo. 2018). We "evaluate[] counsel under the circumstances existing at the time of the challenged act or omission and from the perspective available at the time of the challenged act or omission." *Larkins*, ¶ 62, 429 P.3d at 43–44 (citation omitted). To show prejudice, the appellant must show "a reasonable probability exists that [he] would have enjoyed a more favorable verdict." *Id.* (citing *Strickland*, 466 U.S. at 687, 695, 104 S.Ct. at 2064, 2068). "We invoke a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Brock v. State*, 2012 WY 13, ¶ 10, 272 P.3d 933, 936 (Wyo. 2012) (citation omitted); *see also Duke v. State*, 2004 WY 120, ¶ 55, 99 P.3d 928, 947 (Wyo. 2004) (citing *Asch v. State*, 2003 WY 18, ¶ 41, 62 P.3d 945, 958–59 (Wyo. 2003)).

## E. Failure to Investigate

[¶61] Mr. Pickering argues that because defense counsel lacked time to reasonably investigate, they relied on undeveloped defense theories at trial, and they did not interview the officers alleged to be victims.

[¶62] "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Brock*, ¶ 17, 272 P.3d at 938 (quoting *Asch*, ¶ 40, 62 P.3d at 958).

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. . . . [W]hat investigation decisions are reasonable depends critically on such information. . . . *Strickland v. Washington*, [466 U.S. at 691,] 104 S.Ct. at 2066.
>
> The reasonableness of investigation decisions depends on other evidence as well. "[I]n those cases involving claims of inadequate investigation . . . consideration [must be given to] the strength of the evidence known to counsel that suggested further inquiry was needed." 2 LaFave & Isr[ae]l, Crim. Proc. § 11.10(d) at 25 (1986 Pocket Part).
> *Asch*, ¶ 40, 62 P.3d at 958.

*Brock*, ¶ 17, 272 P.3d at 938.

### 1. Undeveloped Theories

[¶63] We first address the argument that counsels' failure to conduct a reasonable investigation led to undeveloped theories such that no complete defense theory was presented at trial. Mr. Pickering argues that "[t]hough the defense had three working theories at trial, none of these theories were complete or cohesive." According to Mr. Pickering, the first theory—Mr. Pickering was not shooting at the officers—required a bullet trajectory expert to develop evidence that none of the bullets exited the house near the officers. No bullet trajectory expert was retained. The second theory—Mr. Pickering did not have the required mens rea—required a mental health expert and none was retained. Third, Mr. Pickering argues that effective presentation of his sudden heat of passion theory "would have required a proposed jury instruction for a lesser-included offense"—voluntary manslaughter—which was not offered.

### 2. Lesser Included Instruction

22

[¶64] Addressing the third theory first, our review of the record reveals that Mr. Pickering's trial counsel did propose lesser included offense instructions. In his pretrial memorandum, Mr. Pickering's counsel requested jury instructions including:

> 21.05A **Voluntary Manslaughter**;
> 21.05B Voluntary Defined;
> 21.05C Sudden Heat of Passion – Defined;
> 21.05D Involuntary Manslaughter[.]

(Emphasis added.) Mr. Pickering's claim that counsel were deficient for failing to propose a lesser included offense instruction fails because the instruction was requested. "An appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient." *Eaton v. State*, 2008 WY 97, ¶ 36, 192 P.3d 36, 61 (Wyo. 2008) (citation omitted).

### 3. Failure to Interview Witnesses

[¶65] We turn to Mr. Pickering's argument that trial counsel's failure to interview the alleged victims was ineffective. Mr. Pickering argues that, had counsel known where the Blue Team was, it could have developed the theory that he did not fire his weapon in the direction of the officers. Mr. Pickering contends that, had trial counsel interviewed the officers/victims, they would have known that Sergeant Komrs was going to testify that Mr. Pickering was pointing his firearm at the officers, and they would have known where the Blue Team was positioned.

[¶66] Whether trial counsel interviewed the alleged officers/victims is unclear from this record.[15] If we assume that counsel did not interview the officers and failure to do so was deficient, Mr. Pickering has not established that he was prejudiced by that failure. "[A]n appellant cannot prove ineffective assistance of counsel for failure to investigate 'where [he] fails to identify the *favorable evidence or witnesses that additional investigation would have revealed.*'" *Winters v. State*, 2019 WY 76, ¶ 46, 446 P.3d 191, 208 (Wyo. 2019) (quoting *Brock*, ¶ 17, 272 P.3d at 938).

[¶67] Mr. Pickering does not identify what favorable evidence an interview of the officers would have garnered. He does not advance additional points that could have been made on cross-examination of the officers. Evidence introduced at trial included

---

[15] Even assuming trial counsel did not interview the officers/victims, counsel had access to the officers'/victims' statements and locations by way of the affidavit of probable cause attached to the Information and the officers' individual reports in case narratives produced in discovery. At the Rule 21 hearing, counsel (Gerard) testified that the defense team was generally aware of the officers' impending testimony based on case narratives received in the course of discovery. However, he explained that "each individual's report . . . did not provide sufficient detail to let us know where they actually were."

23

testimony that bullets sounded as if they were moving in the group's direction, "cracking over" their heads, and "coming closer" to them.

[¶68]  Mr. Pickering argues that he did not need to prove prejudice because prejudice is presumed when the deficient performance of counsel is the failure to interview an eyewitness.  He relies on *Asch*, ¶ 43, 62 P.3d at 959.  In *Asch*, we stated, the "[f]ailure to interview an eyewitness is so egregious that it has been considered ineffective assistance of counsel without the need to show prejudice, such being presumed." *Id.* (citing *King v. State*, 810 P.2d 119, 123 (Wyo. 1991); *Gist v. State*, 737 P.2d 336, 343 (Wyo. 1987)).  In *Asch*, trial counsel did not obtain transcripts of the preliminary hearing, made no assessment regarding whether testimony at the preliminary hearing would be useful in impeaching witnesses at trial, and then failed to cross-examine the arresting officer (who was one of only two witnesses for the prosecution) regarding inconsistent statements he made at the preliminary hearing.  *Asch*, ¶ 44, 62 P.3d at 959.  *Asch* "involved a failure to effectively cross-examine a key witness."  *Winters*, ¶ 52, 446 P.3d at 209 n.13 (citing *Asch*, ¶ 45, 62 P.3d at 959).

[¶69]  The *Asch* language cited by Mr. Pickering emanates from *King*, 810 P.2d at 123, a case we recently considered in *Winters*, ¶ 51, 446 P.3d at 209.  There the appellant asserted, as does Mr. Pickering, that prejudice is presumed when counsel fails to interview witnesses.  We explained,

> In *King*, defense counsel failed to interview or secure the testimony of two alleged eye-witnesses who would have likely supported Mr. King's claim the crime never occurred. [*King*, 810 P.2d] at 120–22. We concluded:
>
> > "The failure to pursue an interview [with an alleged eye witness] constitute[s] an abrogation of counsel's duty to * * * conduct a reasonable investigation and to utilize any information obtained in providing a reasonable defense." *Gist*, 737 P.2d at 343.  *When this deficiency is demonstrated, the appellant need not demonstrate the resulting prejudice, it is presumed.* "Prejudice in [this circumstance] is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 69[2], 104 S.Ct. at 2067.  *See also Sanders v. Sullivan*, 701 F. Supp. 996 (S.D.N.Y. 1987), also involving a failure to secure attendance at trial; and *Richardson v. State*, 189 Ga. App. 113, 375 S.E.2d 59 (1988), where proposed alibi witnesses were neither interviewed nor subpoenaed.

24

> *King*'s reliance on *Strickland* is misplaced, as *Strickland* was speaking to the "[a]ctual or constructive denial of the assistance of counsel altogether" and "state interference with counsel's assistance." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067. In any event, this case is clearly distinguishable from *King*.
>
> There, trial counsel failed not only to interview two potential eye-witnesses with favorable information, he also failed to secure their trial testimony. *King*, 810 P.2d at 120–22.

*Winters*, ¶¶ 51–52, 446 P.3d at 209.

[¶70] In *Winters*, we said *King*'s reliance on *Strickland*, for the proposition that prejudice is presumed when counsel fails to interview a witness, is misplaced. The *Strickland* language cited in *King* referred to ineffective assistance of counsel in general, not the failure to interview a witness. Mr. Pickering's case is also distinguishable from *King*.[16] Assuming Mr. Pickering's counsel failed to interview the officers/victims, counsel had access to and read officer/victim statements. Trial counsel knew, generally, what the officers' testimony would be. And, unlike the potential witnesses in *King*, the officers testified during trial, and Mr. Pickering's counsel had the opportunity to cross-examine them. It is unclear how an interview of the officer witnesses would have enhanced Mr. Pickering's chances of acquittal, especially given their testimony at trial. *See supra* ¶¶ 4–7. Mr. Pickering has not established trial counsel were deficient in failing to interview the officers/victims, and Mr. Pickering has not shown he was prejudiced as a result.

### 4. Failure to Retain a Bullet Trajectory Expert

[¶71] Mr. Pickering is required to "show an expert was available who would have testified consistently with his theory" to meet his burden in establishing ineffective assistance "based upon the failure to call an expert witness." *Cooper v. State*, 2014 WY 36, ¶ 22, 319 P.3d 914, 920 (Wyo. 2014). Mr. Pickering failed to produce an expert who would have testified consistently with his theory and that failure is fatal to his claim.

---

[16] In addition to *King*, *Asch* cited *Gist* for the proposition that prejudice is presumed when counsel fails to interview an eyewitness. *Asch*, ¶ 43, 62 P.3d at 959. In *Gist*, we held counsel was deficient in not interviewing Mr. Gist's brother because Mr. Gist contended his brother committed the alleged crime and his brother later confessed to the crime. *Gist*, 737 P.2d at 339, 343. We concluded Mr. Gist was prejudiced, not because prejudice is presumed, but because Mr. Gist was actually prejudiced—had his brother testified at trial, Mr. Gist's "chances of acquittal would have been materially enhanced." *Id.* at 343.

25

### 5. Failure to Retain a Mental Health Expert

[¶72] Mr. Pickering argues that trial counsel were ineffective for failure to retain a mental health expert. Mr. Pickering asserts that a mental health expert witness would have testified that he was incapable of acting "purposely and maliciously" and, therefore, he could not have had the required mental state to commit attempted second-degree murder.

[¶73] "When an ineffective assistance claim is based upon the failure to call an expert witness, the defendant must show an expert was available who would have testified consistently with his theory." *Id.* At his Rule 21 hearing, Mr. Pickering presented the testimony of Dr. Wachtel, a forensic psychologist. In Dr. Wachtel's "preliminary opinion," Mr. Pickering "was not acting purposely and maliciously" and so he "did not have the intent to commit" attempted second-degree murder. Mr. Pickering argues that Dr. Wachtel's testimony would have established that he was incapable of acting with malice; instead, he was acting in a heat of passion.

[¶74] The district court determined that because the proposed testimony was not admissible, Mr. Pickering could not establish that a mental health expert was "available who would have testified consistently with his theory." *See Cooper*, ¶ 22, 319 P.3d at 920. The district court concluded that the failure to call a mental health expert was not deficient. We agree.

[¶75] We have said:

> Wyoming has not recognized a diminished capacity defense. . . . [T]he legislature has set forth the standards relating to the mental conditions that will constitute a defense to a criminal charge, and it is not our duty to increase or decrease those standards. *Price v. State*, 807 P.2d 909, 915 (Wyo. 1991). This reasoning applies with equal force to a claim that mental condition prevented the accused from forming the requisite specific intent. *Id.*

*Keats v. State*, 2005 WY 81, ¶ 22, 115 P.3d 1110, 1119 (Wyo. 2005). In *Keats*, we concluded that absent a claim for NGMI, a defendant may not assert that they lacked the mental capacity to form the requisite specific intent. *Id.* Without an NGMI defense, Dr. Wachtel's testimony was inadmissible.[17] Dr. Wachtel, or an expert offering to testify

---

[17] Mr. Pickering may have been able to introduce testimony regarding his mental illness if he had asserted an NGMI defense. *See Keats*, ¶ 25, 115 P.3d at 1120. Mr. Pickering refused to enter an NGMI plea, and

similarly, would not have been "available" because there was no NGMI plea and such testimony is not admissible in the absence of one. Mr. Pickering has not established ineffective assistance of counsel.

[¶76] Mr. Pickering has failed to sustain his burden of proving that he was deprived of his constitutional right to the effective assistance of counsel. He has not demonstrated that counsels' performance was outside the range of professionally competent assistance or that the outcome of his trial would have been different absent attorney error.

## IV.  *Did the district court abuse its discretion when it denied Mr. Pickering's pretrial motion to continue the trial?*

[¶77] Mr. Pickering next asserts that the district court abused its discretion when it denied his motion to continue trial.

### A.  Standard of Review

[¶78] "[T]he grant or denial of a motion for continuance is a discretionary ruling of the district court and, unless a clear showing of an abuse of discretion resulting in manifest injustice has been shown by the challenging party, we will not disturb that ruling." *Palomo v. State*, 2018 WY 42, ¶ 10, 415 P.3d 700, 703 (Wyo. 2018) (quoting *Grady v. State*, 2008 WY 144, ¶ 18, 197 P.3d 722, 729 (Wyo. 2008)). "The party attacking the court's ruling bears the burden of establishing the abuse of discretion." *Sincock v. State*, 2003 WY 115, ¶ 25, 76 P.3d 323, 334 (Wyo. 2003) (quoting *Cardenas v. State*, 811 P.2d 989, 994 (Wyo. 1991)). The determination of whether the district court abused its discretion in refusing to grant a continuance is highly dependent upon the facts and circumstances of the individual case. *Sincock*, ¶ 25, 76 P.3d at 333. "On review, [the] primary consideration is the reasonableness of the district court's decision." *Palomo*, ¶ 10, 415 P.3d at 703 (citing *Grady*, ¶ 18, 197 P.3d at 729).

### B.  Analysis

[¶79] Mr. Pickering's original attorney entered an appearance on November 14, 2017. After Mr. Pickering complained to the court about this attorney, the district court allowed the attorney to withdraw and appointed new defense counsel. Mr. Pickering's new counsel entered an appearance on December 14, 2017. Trial was scheduled to begin March 19, 2018, with Mr. Pickering's case stacked tenth. On February 23, 2018, approximately three weeks prior to trial, defense counsel moved for a continuance over Mr. Pickering's objection. At the motion hearing, lead counsel informed the court he had

---

an NGMI plea may not be entered by counsel over the objection of a defendant. *McLaren v. State*, 2017 WY 154, ¶¶ 62–63, 407 P.3d 1200, 1215–16 (Wyo. 2017).

formed a "team" of three attorneys to represent Mr. Pickering. He argued that even with this team of attorneys, there was "no way" they could be ready for trial given the gravity of the case, the volume of evidence, and the attorneys' other caseloads.

[¶80] The district court denied the motion on several grounds. First, recognizing Mr. Pickering's objection to a continuance, the district court expressed concern that Mr. Pickering had been in jail for over a year.[18] Second, the district court concluded that while "[t]here are a lot of witnesses and there are a lot of . . . alleged victims," the case "does not appear to be incredibly complicated." Third, the district court was troubled by the timing of the motion—three weeks before trial—and the problems associated with a continuance, given the court's schedule and Mr. Pickering's right to a speedy trial. Finally, the district court noted the unusually large team of three public defenders, with associated staff, assigned to work on Mr. Pickering's case, as well as the availability of Mr. Pickering's prior attorney who "did a tremendous amount of work on this case" and could "lend his knowledge and expertise to background and preparation."

[¶81] Mr. Pickering argues that the trial court abused its discretion. He alleges the denial of the continuance caused his counsel to be ineffective, resulting in manifest injustice.[19] He asserts his attorneys did not have adequate time to prepare and consequently presented an incomplete defense with undeveloped theories. Specifically, Mr. Pickering argues that counsel were unable to present theories that required a lesser-included offense instruction, a bullet trajectory expert, and a mental health expert.

[¶82] Mr. Pickering has not established that additional time was necessary for his attorneys to propose a sudden heat of passion, lesser included offense instruction—that instruction was proposed by counsel in their pretrial memo, *supra* ¶ 64; he has not established that a ballistics expert would have been available or would have presented evidence helpful to his case, *supra* ¶ 71; or that time would have enabled him to present mental health expert testimony (that testimony would have been inadmissible, *supra* ¶¶ 72–76). As the district court concluded, Mr. Pickering was represented by three attorneys and associated staff who had access to the information and trial preparation of his prior counsel. Speedy trial concerns and the time served by Mr. Pickering also support the ruling. The district court did not abuse its discretion when it denied the motion to continue.

*V.* **Did the district court err when it denied Mr. Pickering's motion for judgment of acquittal?**

---

[18] This delay was a result of the State's dismissal of the case, refiling the instant case, Mr. Pickering's requests for new counsel, and delays in obtaining a competency evaluation from the State Hospital.

[19] We address Mr. Pickering's claim of ineffective assistance of counsel, *supra* ¶¶ 47–76.

[¶83] Mr. Pickering argues that the district court erred when it denied his motion for judgment of acquittal on the charges of attempted second-degree murder and aggravated assault and battery.

## A.     Standard of Review

[¶84]  This Court reviews a motion for judgment of acquittal in the same light as the district court.  *Bean v. State*, 2016 WY 48, ¶ 43, 373 P.3d 372, 387 (Wyo. 2016).  "[W]e examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom."  *Foltz v. State*, 2017 WY 155, ¶ 10, 407 P.3d 398, 401 (Wyo. 2017) (quoting *Bruce v. State*, 2015 WY 46, ¶ 52, 346 P.3d 909, 926 (Wyo. 2015)).  "As a practical matter, the standard of review for denial of a motion for judgment of acquittal is the same as that used when an appeal claims insufficient evidence to convict."  *Foltz*, ¶ 10, 407 P.3d at 401.

[¶85]  Our task is to determine whether the evidence could reasonably support the factfinder's verdict.  *Jackson v. State*, 2019 WY 81, ¶¶ 12–13, 445 P.3d 983, 988 (Wyo. 2019); *Bean*, ¶ 45, 373 P.3d at 387.

> [W]e do not reweigh the evidence or re-examine the credibility of the witnesses.  *Bean*, ¶ 45, 373 P.3d at 387.  Instead, we simply determine "whether or not the evidence could reasonably support such a finding by the factfinder."  *Id.* (quoting *Hill v. State*, 2016 WY 27, ¶ 13, 371 P.3d 553, 558 (Wyo. 2016)).  "We review the sufficiency of the evidence 'from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt.'"  *Id.* (quoting *Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 966 (Wyo. 2015)).  This standard applies whether the evidence supporting the conviction is direct or circumstantial.  *Id.*, ¶ 44, 373 P.3d at 386 (quoting *Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738–39 (Wyo. 2012)).

*Foltz*, ¶ 10, 407 P.3d at 401–02.

## B.     Attempted Second-Degree Murder

[¶86]  The jury found Mr. Pickering guilty of three counts of attempted second-degree murder.  Second-degree murder is defined as: "[W]hoever purposely and ***maliciously***, but without premeditation, kills any human being is guilty of murder in the second degree."  Wyo. Stat. Ann. § 6-2-104 (LexisNexis 2019) (emphasis added).  "A person is guilty of

an attempt to commit a crime if . . . [w]ith the intent to commit the crime, he does any act which is a substantial step towards commission of the crime." Wyo. Stat. Ann. § 6-1-301(a)(i) (LexisNexis 2019).

[¶87] Mr. Pickering contends that the district court erred when it denied his motion for judgment of acquittal on the attempted second-degree murder charges. He argues no reasonable juror could have found him guilty of attempted second-degree murder because there was insufficient evidence to show he acted "maliciously."

[¶88] The jury instructions defined the term "maliciously" as "the act constituting the offense was done without premeditation, was reasonably likely to result in death, was done recklessly under circumstances manifesting an extreme indifference to the value of human life and was done without legal justification or excuse."[20] Mr. Pickering relies on the "reasonably likely to result in death" language. He contends that the evidence does not support the jury's conclusion that his actions were "reasonably likely to result in death" because no bullet holes were found in the wall near where the alleged victims were positioned, and no bullets were recovered outside the house.[21]

[¶89] Sergeant Komrs testified that he, Detective Nation, and Officer Christoffersen (the Blue Team and the victims of the attempted second-degree murder charges) waited until

---

[20] The trial transcript indicates the district court orally recited the definition of "maliciously" using the phrase "likely to result in death" and not "reasonably likely to result in death." We will consider the language used in the written instructions provided to the jury. W.R.Cr.P. 30(a) requires the jury be provided a copy of the instructions during deliberation, and we assume the jury followed those instructions. *Schmuck v. State*, 2017 WY 140, ¶ 42, 406 P.3d 286, 300 (Wyo. 2017). Further, Mr. Pickering referenced the "reasonably likely to result in death" language in both closing arguments and in his motion for acquittal.

[21] The "reasonably likely to result in death" language in the trial court's definition of "maliciously" is not required under Wyoming law. In *Wilkerson*, we concluded that our precedent defining "maliciously" in the second-degree murder statute as requiring a showing of "'hatred, ill will, or hostility' or the mere absence of 'legal justification or excuse'" set an improperly low threshold to convict a defendant of second-degree murder. *Wilkerson v. State*, 2014 WY 136, ¶ 24, 336 P.3d 1188, 1199 (Wyo. 2014); *see also Schmuck*, ¶ 59, 406 P.3d at 305; *Sindelar v. State*, 2018 WY 29, ¶ 43, 416 P.3d 764, 774–75 (Wyo. 2018). We held that for second-degree murder, the "jury must be instructed that 'malice' means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, *and* that the act was done without legal justification or excuse." *Wilkerson*, ¶ 27, 336 P.3d at 1200. In *Sindelar*, ¶ 36, 416 P.3d at 773, the jury was provided a definition of "maliciously" identical to the one here. The *Sindelar* Court recognized that the "reasonably likely to result in death" language was not contained in the "heightened recklessness language we adopted in *Wilkerson*," but acknowledged "it incorporates many of the same concepts." *Id.* ¶ 43, 416 P.3d at 775. While the language is contained in instruction 21.04B of the Wyoming Criminal Pattern Jury Instructions (2018), we reiterate here that there is no need to include the "reasonably likely to result in death" language in the definition of "maliciously" for second-degree murder. Neither party objected to the district court's proposed use of the language and neither party raises it as an issue. Accordingly, we do not address it.

30

Mr. Pickering was on the other side of the house before they approached the master bedroom window and broke it. Their plan was to impel "a handheld cannister of gas into the room" which would hopefully cause Mr. Pickering to exit the house. According to Sergeant Komrs, "As soon as . . . Mr. Pickering heard the window break, there began a rapid succession of gunshots. It sounded to us as if they were down the hallway, and it sounded like they were rapidly moving in our direction as if he was firing in our direction, coming towards us firing." Sergeant Komrs estimated that between six and twelve rounds were fired.[22]

[¶90] Applying our standard of review to the evidence presented at trial, we are convinced the State presented sufficient evidence to sustain Mr. Pickering's attempted second-degree murder convictions. The district court properly denied his motion for judgment of acquittal.

## C.    Aggravated Assault and Battery

[¶91] The jury found Mr. Pickering guilty of thirteen counts of aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii). Section 6-2-502(a)(iii) states that a defendant is guilty of aggravated assault and battery when he "[t]hreatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]" Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2019). Mr. Pickering argues that because the State failed to establish beyond a reasonable doubt that he made an "actual threat" on the alleged victims, the district court erred in denying his motion for acquittal on the aggravated assault and battery counts. He maintains he never made an actual threat because he never made verbal threats, he pointed the pistol to his own head, he told the negotiator he had no intention of harming officers, and he indicated that the only person he would harm would be himself.

[¶92] "[T]he element of 'threatens to use' requires 'proof of an actual threat of physical injury during the act of employing a deadly weapon.'" *Birch v. State*, 2018 WY 73, ¶ 13, 421 P.3d 528, 533 (Wyo. 2018) (quoting *Hill v. State*, 2016 WY 27, ¶ 15, 371 P.3d 553, 558–59 (Wyo. 2016)). "[T]he mere presence of a weapon in hand is insufficient to satisfy the 'threatens to use' element." *Hill*, ¶ 15, 371 P.3d at 559. A threat "may be expressed by words or acts, or a combination of words and acts" that "amount[] to an express or implied statement of [the defendant's] intention to use a drawn deadly weapon[.]" *Id.* (citing *Johnston v. State*, 747 P.2d 1132, 1135 (Wyo. 1987)).

---

[22] Officer Christoffersen testified six to seven rapid shots were fired toward them. Detective Nation testified that he heard six to seven shots that were "muffled" at first but "became louder" as they were "coming closer to us."

The lack of a verbal threat does not necessarily defeat a charge of aggravated assault. A threat to use a drawn deadly weapon may be proven solely by a defendant's actions or may be proven by words, or a combination of words and actions. *Johnston*, 747 P.2d at 1133 (threat "may be expressed by words or acts, or a combination of words and acts"). Further, the notion that the rifle may not have been pointed in the direction of the officers at the time it was fired does not mean that a jury could not properly infer that the shot was an expression of an intention to inflict pain, injury, or punishment. *See Hart v. State*, 2003 WY 12, ¶¶ 6, 10, 62 P.3d 566, 569–70 (Wyo. 2003) (holding handgun in the air for victim to see was sufficient to constitute a threat).

*Hill*, ¶ 17, 371 P.3d at 559.

[¶93] In *Hill*, law enforcement officers had been in pursuit of the defendant. The defendant sped away from the officers, "reaching a speed of 90 miles per hour, and when his vehicle stopped, he fled on foot with his AK-74 rifle in hand." *Id.* ¶ 20, 371 P.3d at 560. He defied their orders to show them his hands and get on the ground and fired one shot as he ran away from the officers. *Id.* Two minutes later, he fired an additional three shots. *Id.* He was convicted of aggravated assault and appealed, arguing there was insufficient evidence of an actual threat. *Id.* ¶ 11, 371 P.3d at 558. We affirmed, holding there was sufficient evidence for a jury to conclude he made an actual threat. *Id.* ¶ 20, 371 P.3d at 560. *See also Hart v. State*, 2003 WY 12, ¶ 6, 62 P.3d 566, 568–69 (Wyo. 2003).[23]

[¶94] Here, viewing the evidence in the light most favorable to the State, we find a reasonable jury could conclude that Mr. Pickering made an actual threat against the officers.[24] The district court did not err in denying Mr. Pickering's motion for judgment of acquittal.

---

[23] In *Hart*, the defendant pulled a gun out of the back of his pants. He held it up, pointed it toward the sky directly in front of a window, so that his ex-wife's father could see. *Hart*, ¶ 6, 62 P.3d at 569. When his ex-wife's father refused to allow him to enter his home, the defendant walked toward his pickup truck, shot four rounds into his ex-wife's pickup truck, and then drove off. *Id.* The defendant appealed, alleging insufficient evidence. We affirmed, holding that "given Hart's demands and his display of a deadly weapon to the man resisting the demands, we are satisfied that a jury could rationally conclude that Hart made an actual threat to use a drawn deadly weapon [on his ex-wife's father]." *Id.* ¶ 10, 62 P.3d at 569–70.

[24] Mr. Pickering fired toward Sergeant Komrs, Detective Nation, and Officer Christoffersen (the three alleged victims of the attempted second-degree murder charges). Moreover, the shots were fired in the direction of the officers who were observing the house from a distance. Sergeant Zertuche testified that he "heard one of the rounds hit the wire, the fence where we were at, and ricochet off it." He explained

## VI.    *Did cumulative error deprive Mr. Pickering of a fair trial?*

[¶95]  Mr. Pickering argues that the accumulation of the foregoing alleged errors requires the reversal of his conviction.  "Cumulative error occurs when two or more nonreversible errors have the potential to prejudice the defendant to the same extent as a single reversible error."  *McGill v. State*, 2015 WY 132, ¶ 21, 357 P.3d 1140, 1148 (Wyo. 2015); *Carrier v. State*, 2017 WY 88, ¶ 47, 400 P.3d 358, 368 (Wyo. 2017); *McClelland v. State*, 2007 WY 57, ¶ 27, 155 P.3d 1013, 1022 (Wyo. 2007).  "However, reversal of a conviction is appropriate only when the accumulated effect of the errors 'constitutes prejudice and the conduct of the trial is other than fair and impartial.'"  *McGill*, ¶¶ 20–22, 357 P.3d at 1148 (citations omitted).  "In resolving whether cumulative error has occurred we consider only those matters which we determine constitute error."  *Id.* (citations omitted).

[¶96]  We have rejected each of Mr. Pickering's claims of error.  There is no basis for his claim of cumulative error.  "A claim of cumulative error cannot be recognized where there is no underlying error to support it."  *Luedtke v. State*, 2005 WY 98, ¶ 36, 117 P.3d 1227, 1234 (Wyo. 2005) (quoting *Young v. State*, 849 P.2d 754, 767 (Wyo. 1993)); *McGill*, ¶¶ 20–22, 357 P.3d at 1148.

## CONCLUSION

[¶97]  The district court's finding of no discriminatory purpose in the State's exercise of peremptory challenges was not clearly erroneous.  Mr. Pickering's right to a fair trial was not denied when the district court refused to individually query jurors about pretrial publicity.  The district court did not abuse its discretion when it denied Mr. Pickering's pretrial motion to continue the trial, and it did not err in denying his motion for judgment of acquittal.  Mr. Pickering did not establish ineffective assistance.  Finally, because we find no error, cumulative error did not deprive Mr. Pickering of a fair trial.  We affirm.

---

that the shot was "coming from the residence towards us" and that the "ricochet was off to my right, and maybe, I'm not sure, maybe 5, 7 yards, 10, 15 feet to my right, and just whizzed behind us."

Other officers testified similarly.  Deputy Armstrong testified that he heard a bullet ricochet near him.  Deputy Erlandson stated that he heard a bullet ricochet past his location.  Deputy Deyo testified that a bullet passed between himself and another deputy.  Lieutenant Romero testified that he heard one of the shots hit the hill where deputies were positioned.  Deputy Foutz testified he heard a bullet pass him.  Officer Larsen testified that he heard a bullet fly overhead.  Sergeant Fyler testified that a bullet flew "in a close proximity."  Sergeant Zertuche also testified that after the team was able to deploy the gas into the bedroom, "there were more shots coming from inside the residence."  Sergeant Zertuche explained that the team deployed additional rounds of gas into the residence.  He described, after the first two bursts of gunfire, "[j]ust about every time something was deployed into the residence, a shot would be fired here and there.  It was random."